Mark A. Kleiman (SBN 115919)
KLEIMAN / RAJARAM
2907 Stanford Ave. Venice, CA 90292
Telephone: (310) 306-8094
Facsimile:  (310) 306-8491
Email: mkleiman@quitam.org

Ben Gharagozli (SBN 272302)
Law Offices of Ben Gharagozli
2907 Stanford Avenue
Marina del Rey, California 90292
Telephone: (661) 607-4665
Facsimile:  (855) 628-5517
Email: ben.gharagozli@gmail.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMAR ABDULAZIZ, <br><br>         Plaintiff, <br>         v. <br><br> TWITTER, Inc..; McKINSEY & Co.; and DOES 1-10; inclusive, <br><br>         Defendants. | ) Case No.: <br> ) <br> ) **COMPLAINT AND DEMAND FOR** <br> ) **JURY TRIAL** <br> ) <br> ) <br> ) <br> ) <br> ) |

1.     This is an action to vindicate the rights of Omar Abdulaziz, a political refugee who has been granted political asylum in Canada from the despotic regime in the Kingdom of Saudi Arabia ("KSA").  Because of the tremendous wealth of key figures in KSA, major corporations have enabled, collaborated with, and turned a blind eye to KSA's efforts to suppress, torture, falsely imprison, terrorize, and murder dissenters both within Saudi Arabia and around the world.  Twitter, Inc., and McKinsey & Co. have individually invaded Plaintiff's privacy and exposed him, his family members, friends and political associates to imprisonment, torture, and even death.

**PARTIES**

2.      Plaintiff Omar Abdulaziz (hereinafter "Plaintiff") is a graduate student and political dissident who has been granted asylum in Canada because he faced likely persecution were he to return to his native country, Saudi Arabia.

3.      Defendant Twitter, Inc., (hereinafter "Twitter") is incorporated in Delaware with its headquarters in San Francisco, California.  In 2011 Saudi Prince Alwaleed Bin Talal purchased $300 million worth of stock in Twitter.  In 2015 Bin Talal made an additional investment, owning 5.2% of the company, more than Twitter's founder and CEO.

4.      Defendant McKinsey & Co. (hereinafter "McKinsey") describes itself as an incorporated partnership established in the State of Illinois.  It does have offices in and transacts business in San Francisco, California and Redwood City, California.

5.      The true and identity of each defendant denominated as a "Doe" is unknown to plaintiff at this time, so said defendants are sued in this capacity.  As each such defendant becomes known to Plaintiff he shall seek leave amend this Complaint to set forth that defendant's true identity.

**JURISDICTION**

6.      Jurisdiction is proper because this action includes claims that Twitter violated or ratified it's employee's violation of the Stored Communications Act, 18 U.S.C. §2701, *et. seq.*

7.      To the extent that the conduct giving rise to this action also implicates state law claims, this Court is requested to exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. §1367.  Alternatively, diversity jurisdiction exists pursuant to 28 U.S.C. §1332.

**VENUE**

8.      Venue is proper in this district under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district.

# FACTUAL ALLEGATIONS

9.      In 2009 Plaintiff moved from Saudi Arabia to Canada after he was admitted to study at a Canadian university.  While he was in Montreal as a student, Plaintiff, who is talented in the use of social media, began to discuss the internal political affairs of KSA. Plaintiff began to provide political commentary using Twitter and other media websites.  His main contribution was criticism of the way the country was run, criticism of the royal family, corruption, and the foreign policy of KSA.  Plaintiff was especially vocal about the grave violations of human rights in KSA, the disregard for Saudi citizens, and their rights and freedoms.

10.      Saudi authorities retaliated by harassing Plaintiff.  As a result, Plaintiff applied for asylum in Canada on or about December 31, 2013.  The application was approved on February 21, 2014.

11.      In response to this political persecution, Plaintiff increased his political activities as a harsh critic of the rule of KSA, and he was especially popular among the youth in Saudi Arabia. Today Plaintiff has over 400,000 followers on Twitter and the over 163,000 subscribers on YouTube channel he runs and on which he broadcasts his political views. In addition, Plaintiff contributes to and manages, together with other pro-democracy activities, a number of websites, Twitter accounts and YouTube channels.

12.      Plaintiff was also a close friend of Jamal Khashoggi who was murdered in Istanbul in the beginning of October 2018 by a group of assassins related to the security and intelligence services of KSA.  After Mr. Khashoggi left Saudi Arabia and moved to the United States, a friendship developed between plaintiff and Mr. Khashoggi.  The two started to cooperate on a range of political activities with the objective of targeting public opinion in Saudi Arabia. The political partnership became stronger and the two cooperated on various projects. However, most of the projects did not materialize because this partnership and friendship was suddenly cut short when Mr. Khashoggi was brutally murdered in the Saudi Consulate in Istanbul, Turkey.

13.     Plaintiff has been recognized as one of the most influential voices contributing to the shaping of public opinion in KSA, especially among the youth.  In December 2016 or January 2017, McKinsey identified Plaintiff as one of the top three voices shaping public opinion about developments in KSA.  The other two individuals were Mr. Khaled Al-Alkami and an individual named "Ahmad."  A true and accurate copy of what Plaintiff believes is the McKinsey's report is attached as Exhibit A.  McKinsey provided a copy of this report to MBS.

14.     McKinsey has played a critical role in MBS' drive to consolidate power in KSA. McKinsey has earned many millions of dollars in projects in Saudi Arabia.  Between 2010 and 2016, McKinsey's project portfolio in Saudi Arabia has grown exponentially.  McKinsey has directly advised government agencies in KSA to the point that KSA's Ministry of Planning has acquired the nickname "Ministry of McKinsey" by some Saudis, including KSA's royal court. In 2017, McKinsey purchased a politically connected Saudi consultancy, which added 140 more employees to McKinsey's already 300 employees in the region.

15.     McKinsey has maintained an office in Riyadh, the capitol of Saudi Arabia.  The company's website boasts that its "Saudi Arabia Practice helps Saudi leaders."

16.     The Brookings Institute attributes "the Kingdom's new economic direction" and a major government cabinet reshuffling of high-ranking government ministers to McKinsey . MBS himself has admitted that "McKinsey participates with us in many studies."  McKinsey prepared a December 2015 report entitled "Moving Saudi Arabia's Economy Beyond Oil." That December 2015[1] report outlines an ambitious blueprint for KSA's economic transformation and diversification away from oil.  In what the Brookings Institute refers to as a "glaring omission," the December 2015 report fails to sufficiently explain how KSA "will be able to change the mindset of everyday Saudi Arabia citizens, who have long been accustomed to state largesse that included fuel subsidies, loans, free land, and public sector jobs."  The Brookings Institute goes on to insist that this is a "key issue" and questions how everyday

---

[1] The Brookings Institute argues that the December 2015 report inspired MBS's report entitled "Saudi Arabia's Vision 2030".

citizens in Saudi Arabia will react to the reforms, referencing public discontent to a number of higher utility prices, which led to King Salman firing the water minister to appease the public. McKinsey's PowerPoint report, which identified Plaintiff as one of the three loudest voices of discontent against KSA's policies sought to "gauge citizen sentiment on recent austerity measures announced in KSA" by closely analyzing "data from twitter feed."  In other words, McKinsey's PowerPoint presentation filled a crucial blank space in how KSA would be able to pursue delicate and important economic reforms by identifying those who were spreading the most criticism of such reforms.

17.     A New York Times article published on October 20, 2018, after the McKinsey report was issued, Mr. Alkami was arrested, based on accounts by the Saudi human rights group, ALQST.

18.     It was not until the publication of the October 20, 2018 New York Times article that Plaintiff learned that a suspected KSA agent had used the computer access Twitter had granted him to hack into Plaintiff's confidential information.

19.     In mid May 2018, two individuals working for KSA contacted Plaintiff and asked to meet him.  Throughout a series of meetings with Plaintiff, these two individuals identified themselves as agents of the Crown Prince, Mohammad Bin Salman ("MBS"). According to a number of different reports, MBS was the one who gave the order to murder Mr. Khashoggi.  The two agents also indicated that they were operating on orders from Saud Al-Qahtani, who was until recently, a senior strategic advisor to MBS until he was dismissed after the murder of Mr. Khashoggi, because his name was entangled with the murder.

20.     On or about June 29, 2015, Al-Qahtani had emailed a hacking company to ask about its service.  Shortly after that, Khashoggi and other Saudi dissidents were subjected to massive Twitter attacks.

21.     The two agents indicated to Plaintiff that MBS was not happy with Plaintiff's political activities and criticisms against KSA in general and MBS in particular.  The two

agents demanded (a) that Plaintiff stop his criticism of KSA and MBS; (b) that Plaintiff return to Saudi Arabia and return to his family and friends or return and go to prison.

22.     During the meetings, the two agents demanded that Plaintiff accompany them to the Saudi embassy in Ottawa to continue the discussions.  During the meetings, KSA agents brought Plaintiff's younger brother into the room as a message that they can reach and harm Plaintiff's family.  Plaintiff did not accede to the agents' demand that he go to the Saudi embassy in Ottawa.  It should be noted that assassins working for KSA murdered Mr. Khashoggi in a Saudi embassy just a few months later.  Plaintiff also rejected the two agents' demand that he return to Saudi Arabia.

23.     After the meetings with the two agents, Plaintiff continued his political activities and his friendship with Mr. Khashoggi grew closer. In June and July 2018, plaintiff worked with Mr. Khashoggi on the "electronic bees" project, which was intended to organize the large number of Saudi opposition activists to use Twitter in order to deal with what is called as "electronic flies"[2].  Indeed, Mr. Khashoggi transferred $5,000 to Plaintiff to support the "electronic bees" project.

24.     On or about June 23, 2018, agents acting on behalf of KSA using Pegasus software developed by N.S.O Technologies Ltd. And Q Cyber Technologies Ltd., remotely planted malware on Plaintiff's phone.

25.     Subsequently at the end of July 2018 and early August 2018, authorities acting on behalf of KSA increased their harassment campaign.  KSA security forces raided Plaintiff's family home in Jeddah in the middle of the night using search dogs and conducted humiliating searches of the house.  Two of Plaintiff's brothers were arrested and are still in prison without having been charged or receiving a trial.  Security personnel acting on behalf of KSA have been torturing plaintiff's brothers who are in detention to pressure Plaintiff to stop his activism.

---

[2] "Electronic flies" is a group of Twitter activists who take their orders from the Saudi authorities and whose objectives are (1) to attack opposition activities;  (2) to smear them; (3) to praise decisions and actions of MBS.

According to a report by Amnesty International, such conduct is consistent with KSA security personnel's mistreatment of imprisoned activists.

26.     During the first few days of his imprisonment, KSA security personnel would take Plaintiff's younger brother out of his detention cell and ordered him to call Plaintiff to beg Plaintiff to stop his political activities.  They specifically mentioned the "electronic bees" project, which the plaintiff worked on with the late Jamal Khashoggi and a small number of trusted close friends.  That these KSA security personnel knew about Plaintiff's work to this level of detail was shocking to Plaintiff.  Up until then Plaintiff had been unaware that KSA had been spying on him using the Pegasus system on his phone.

27.     Dozens of Plaintiff's friends who live in Saudi Arabia have also been arrested, tortured and subjected to inhumane and humiliating treatment even though most of them are not involved or even interested in politics. KSA security personnel have done this to pressure Plaintiff to stop his political activities.

28.     In mid-August 2018, Plaintiff was informed by Citizens Lab, which is part of the University of Toronto, that all of the information on his phone had been compromised by means of the installation of Pegasus malware.

29.     On October 2, 2018, Mr. Khashoggi entered the Saudi Consulate in Istanbul, Turkey, never to exit.  It was subsequently discovered that Mr. Khashoggi had been murdered by an assassination team sent by KSA (specifically by MBS).  Mr. Khashoggi, who championed democracy, human rights and anti-corruption efforts, had been a fierce critic of KSA.

30.     The collaboration between Plaintiff and Mr. Khashoggi had the potential to build a broad political movement for democratic reform in Saudi Arabia.  Due to hacking Plaintiff's phone, KSA was aware of the collaboration between Plaintiff and Mr. Khashoggi.

31.     KSA agents continue to pressure Plaintiff to stop his political activities.

32.     In December 2016, McKinsey prepared a report that identified three of the most influential individuals on Twitter with respect to criticism of KSA's policies.  Plaintiff was one

of these individuals.  On information and belief, McKinsey subsequently gave the report to MBS.

### The McKinsey Report.

33.     Before McKinsey published the report, Plaintiff was one of many dissidents who protested the corruption and human rights violations of KSA.  After the publication of McKinsey's report, Plaintiff became one of three.  By publishing this report and furnishing it to MBS, McKinsey effectively put a target on Plaintiff's back.

34.     On information and belief McKinsey is still working with MBS and conducting training at his MISK Foundation.

35.     At the drafting of the report, it was foreseeable that such information would be used to target dissidents at least in part because KSA's abysmal human rights record and utter contempt for democratic values, political criticism and freedom of expression is well known.

### Twitter's Flawed Security and It's Misleading of Plaintiff

36.     In 2015, Twitter's terms of service contained a privacy policy.  The privacy policy indicates that direct messages and non-public communications on the Twitter platform allow users' to control who saw their content.  Twitter, due to the herein alleged conduct, has breached the terms of service and privacy policy.

37.     Reports indicate Twitter hired Al Zabarah on or about August of 2013.

38.     As of 2018 Twitter had 3,900 employees and generated over $3 billion of yearly revenue, based upon over 320 million active users.

39.     Known as the "Arab Spring", December 2010 through 2012 saw a wave of popular protests in the Arab world against autocratic governments in the region.  According to numerous social scientists and regional experts and analysts familiar with the region, social media in general and Twitter in particular was at least one of the driving forces behind the "Arab Spring."  Autocratic governments in the Arab world, including KSA have recognized this.

40.     Twitter has also been used as a platform for those seeking the overthrow of autocratic regimes outside of the Arab world, including Moldova and Ukraine.

41.     Nevertheless, on information and belief, Twitter, at around the time of hiring Alzabarah, did not investigate potential employees' political alliances or connections to foreign governments to determine whether such potential hires would abuse their positions to hack into the private and sensitive data of Twitter's users.

42.     When an employee joins Twitter, he or she is supposed to apply for access to certain accounts.  Grants of access depend upon the team of which the employee is a member.

43.     On information and belief, Twitter does not have a practice or policy of periodically investigating the employees to determine whether they pose a danger to the privacy of Twitter's users.

44.     At or about the time Alzabarah penetrated Twitter he met in California with Ahmed Al-Jabreen.  Al-Jabreen founded a Saudi technology company, Samaat, which has ongoing business relationships with MISK, which is an MBS-controlled multi-billion dollar foundation, which later hired Alzabarah as its CEO.

45.     KSA recruited Alzabarah to access Plaintiff's private Twitter information (e.g. direct messages and other confidential data and information that are not available to the public) and leak it to KSA.

46.     The private confidential information Plaintiff had trustingly left in Twitter's care included his unique and complex Twitter password, a private email address and private telephone number, neither of which Plaintiff had shared with the public or with KSA.

47.     Twitter, at the end of 2015, became aware of Alzabarah's activities.  After conducting an investigation, Twitter fired Alzabarah in December 2015.  After Alzabarah's return to Saudi Arabia, MBS appointed him CEO of one of the multi-billion dollar MISK Foundation.

48.     On December 11, 2015, Twitter sent out safety notices to the owners of a few dozen accounts Alzabarah had accessed including security and privacy researchers,

surveillance specialists, policy academics and journalists. The notice included the following: "As a precaution, we are alerting you that your Twitter account is one of a small group of accounts that may have been targeted by state-sponsored actors".   Plaintiff was never sent this safety notice.

49.      Instead, on February 17, 2016 Twitter sent Plaintiff a message indicating, among other things, that Twitter "recently learned about-and immediately fixed-a bug that affected our password recovery systems for about 24 hours last week.  The bug had the potential to expose the email address and phone number associated with a small number of accounts.  In our investigation, we discovered that the email address and phone number linked to your account was viewed by another account and we wanted to alert you as soon as possible."  A true and accurate copy of Twitter's message to Plaintiff is attached as Exhibit B. This message did not warn Plaintiff that his account had been hacked by an agent of KSA despite Twitter having reason to believe that this had happened to Plaintiff's Twitter account.

## First Cause of Action Against Twitter, Inc., and Does 1-5  for Violation of the Stored Communications Act, 18 U.S.C. §2701, et. seq.

50.      Plaintiff repeats and repleads each allegation in Paragraphs 1-49 as though fully set forth herein.

51.      In hacking into and accessing Plaintiff's confidential Twitter information, Alzabarah intentionally exceeded his authorization to access that facility and thereby authorized access to electronic communication while it was in electronic storage.

52.      Plaintiff is informed and believes and based thereon alleges that one or more of Twitter's managing agents ratified this conduct by concealing from Plaintiff the fact that Alzabarah, while likely acting as an agent for Saudi regime, had singled out Plaintiff's account and wrongly obtained access to this information.

53.      As a direct and legal result of Twitter's violation of 18 U.S.C. §2701, Plaintiff has suffered loss of property and has incurred out-of-pocket expenses in excess of $75,000.

Plaintiff had to move out of his apartment, withdraw from his graduate studies, and actually lived in hotels for four months.

54.     As a direct and legal result of Twitter's violation of 18 U.S.C. §2701, Plaintiff has also suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to personal and professional reputation.

55.     Twitter's unlawful actions are intentional, willful, and/or are taken in willful disregard of Plaintiff's 's rights.

56.     In addition to general and economic damages, Plaintiff seeks punitive damages in an amount sufficient to punish Twitter and to protect future Twitter users from Defendant's wrongful practices described herein.

## Second Cause of Action Against Twitter and Does 1-5 for Violation of California Business & Professions Code §17200, et. seq.

57.     Plaintiff repeats and repleads each allegation in Paragraphs 49 as though fully set forth herein.

58.     By doing the acts alleged above herein Twitter has violated the Stored Communications Act, and has engaged in an unlawful business practice that is prohibited by §17200.

59.     By doing the acts alleged above herein Twitter has engaged in a fraudulent or deceptive business practice that is prohibited by §17200.

60.     By doing the acts alleged above herein Twitter has engaged in an unfair business practice that is prohibited by §17200.

61.     As a direct and legal result of Defendant's violation of §17200 et. seq., Plaintiff has suffered loss of property and has incurred out-of-pocket expenses in excess of $75,000.

62.     As a direct and legal result of Defendant's violation of §17200 et. seq., Plaintiff has suffered Dr. Abdulhadi has suffered humiliation, stress, anxiety, emotional distress, pain

and suffering, inconvenience, mental anguish, loss of enjoyment, loss of dignity, and damage to personal and professional reputation.

63.     Plaintiff seeks injunctive relief to protect future Twitter users from Defendant's discriminatory employment practices described herein.

## Third Cause of Action Against Twitter and Does 1-5 for
## Invasion of Privacy

64.     Plaintiff repeats and repleads each allegation in Paragraphs 49 as though fully set forth herein.

65.     Plaintiff had a legally protected privacy interest in the private direct messages he had sent and received via Twitter.

66.     Plaintiff had a legally protected privacy interest in the personal data he had stored on Twitter that contained information regarding his identity, telephone number, etc.

67.     Plaintiff's expectation that this information would remain confidential was reasonable in that Twitter had promised its users that they would have control over such information.

68.     The invasion of Plaintiff's privacy interest in the confidential information and the direct messages was offensive to Plaintiff and would offend a reasonable person.

69.     Plaintiff is informed and believes and based thereon alleges that one or more of Twitter's managing agents ratified this conduct by concealing from Plaintiff the fact that Alzabarah, while likely acting as an agent for Saudi regime, had singled out Plaintiff's account and wrongly obtained access to this information.

70.      As a direct and legal result of Defendant's invasion of Plaintiff's privacy, Plaintiff has suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, mental anguish, and loss of dignity.

71.      Twitter's unlawful actions are intentional, willful, and/or are taken in willful disregard of Plaintiff's 's rights.

72.     In addition to general and economic damages, Plaintiff seeks punitive damages in an amount sufficient to punish Twitter and to protect future Twitter users from Defendant's wrongful practices described herein.

## Fourth Cause of Action Against McKinsey & Co. and Does 6-10 for
## Intentional Infliction of Emotional Distress

73.     Plaintiff repeats and repleads each allegation in Paragraphs 49 as though fully set forth herein.

74.     McKinsey could not help but know of the vicious and brutal methods KSA has used to suppress dissent, including attacks not only on dissenters, but on their close family members and associates.

75.     Despite knowing these dangers, McKinsey intentionally, knowingly, or recklessly named Plaintiff as one of the three most effective critics of KSA policies.

76.     McKinsey's conduct in subjecting Plaintiff and his family to these dangers was outrageous.

77.     As a direct and legal cause of consequence of McKinsey's conduct Plaintiff has suffered severe emotional distress.   Plaintiff suffers and continues to suffer humiliation, stress, anxiety, emotional distress, pain and suffering, mental anguish, and loss of enjoyment.

78.  McKinsey's unlawful actions are intentional, willful, and/or are taken in willful disregard of Plaintiff's 's rights.

79.     In addition to general and economic damages, Plaintiff seeks punitive damages in an amount sufficient to punish Twitter and to protect future Twitter users from Defendant's wrongful practices described herein.

## Fifth Cause of Action Against Twitter and Does 1-5 for
## Intentional Misrepresentation

80.     Plaintiff repeats and repleads each allegation in Paragraphs 1-49 as though fully set forth herein.

81.     Twitter, on or about February 17, 2016, represented to Plaintiff that a bug, that had been fixed, had affected Twitter's password recovery systems for about 24 hours the week prior.  This bug, Twitter represented, "had the potential to expose the email address and phone number associated with a small number of accounts.  In our investigation, we discovered that the email address and phone number linked to your account was viewed by another account and we wanted to alert you as soon as possible."

82.     Such representations were false and/or misleading.  The effect of these representations, even if true, misled Plaintiff into believing that his Twitter account had not been hacked by a Twitter employee who had been recruited by the Kingdom of Saudi Arabia to gain access to Plaintiff's private Twitter information.

83.     Twitter knew that the representations were false when Twitter made the representations.  Alternatively, Twitter made the representations recklessly and without regard for their truth.

84.     Twitter intended that Plaintiff rely on the representations.

85.     Plaintiff reasonably relied on Twitter's representations by not taking the security precautions that he would have done so had he known the truth. .

86.     As a direct and legal result of Twitter's intentional misrepresentations to Plaintiff, Plaintiff has suffered loss of property and has incurred out-of-pocket expenses in excess of $75,000.   Plaintiff had to move out of his apartment, withdraw from his graduate studies, and actually lived in hotels for four months

87.     As a direct and legal result of Twitter's intentional misrepesentation, Plaintiff has also suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to personal and professional reputation.

88.     Twitter's conduct was intentional, willful, and/or are taken in willful disregard of Plaintiff's 's rights. As such, Plaintiff seeks an award of exemplary and/or punitive damages against Twitter in a sum to be determined according to proof at trial.

**<u>Sixth Cause of Action Against Twitter and Does 1-5 for</u>**

**<u>Negligent Misrepresentation</u>**

89.     Plaintiff repeats and repleads each allegation in Paragraphs 1-49 as though fully set forth herein.

90.     Twitter, on or about February 17, 2016, represented to Plaintiff that bug, that had been fixed, had affected Twitter's password recovery systems for about 24 hours the week prior.  This bug, Twitter represented, "had the potential to expose the email address and phone number associated with a small number of accounts.  In our investigation, we discovered that the email address and phone number linked to your account was viewed by another account and we wanted to alert you as soon as possible."

91.     Such representations were false and/or misleading.  The effect of these representations, even if true, misled Plaintiff into believing that his Twitter account had not been hacked by a Twitter employee who had been recruited by the Kingdom of Saudi Arabia to gain access to Plaintiff's private Twitter information.

92.     Although Twitter may have honestly believed that the representations were true, Twitter had no reasonable grounds for believing the representations were true when Twitter made such representations.

93.     Twitter intended that Plaintiff rely on the representations.

94.     Plaintiff reasonably relied on Twitter's representations by not taking the security precautions that he would have done so had he known the truth.

95.     As a direct and legal result of Twitter's negligent misrepresentations to Plaintiff, Plaintiff has suffered loss of property and has incurred out-of-pocket expenses in excess of $75,000.   Plaintiff had to move out of his apartment, withdraw from his graduate studies, and actually lived in hotels for four months.

96.     As a direct and legal result of Twitter's negligent misrepesentation, Plaintiff has also suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to personal and professional reputation.

**<u>Seventh Cause of Action Against Twitter and Does 1-5 for Concealment</u>**

97.     Plaintiff repeats and repleads each allegation in Paragraphs 1-49 as through fully set forth herein.

98.     Twitter, on or about February 17, 2016, represented to Plaintiff that bug, that had been fixed, had affected Twitter's password recovery systems for about 24 hours the week prior.  This bug, Twitter represented, "had the potential to expose the email address and phone number associated with a small number of accounts.  In our investigation, we discovered that the email address and phone number linked to your account was viewed by another account and we wanted to alert you as soon as possible."  However, Twitter did not disclose to Plaintiff that his Twitter account had been hacked by a Twitter employee who had been recruited by the Kingdom of Saudi Arabia to gain access to Plaintiff's private Twitter information.  This misled Plaintiff into believing that his private Twitter information was safe and had not been hacked by a Twitter employee who was an agent of the autocratic regime that Plaintiff criticizes.

99.     Twitter intentionally failed to disclose to Plaintiff that his Twitter account had been hacked by a Twitter employee who had been recruited by the Kingdom of Saudi Arabia to gain access to Plaintiff's private Twitter information [this fact was known only to Twitter (and possibly Western intelligence officials) and Plaintiff could not have discovered them on his own].   This misled Plaintiff into believing that his private Twitter information was safe and had not been hacked by a Twitter employee who was an agent of the autocratic regime that Plaintiff criticizes.

100.     Plaintiff did not know that his Twitter account had been hacked by a Twitter employee who had been recruited by the Kingdom of Saudi Arabia to gain access to Plaintiff's private Twitter information (hereinafter "concealed facts").

101.     Twitter intended to deceive Plaintiff by concealing the concealed facts.

102.     Had the concealed facts been disclosed, Plaintiff reasonably would have behaved differently (e.g. taken safety precautions)

103.     As a direct and legal result of Twitter's concealment, Plaintiff has suffered loss of property and has incurred out-of-pocket expenses in excess of $75,000.   Plaintiff had to move out of his apartment, withdraw from his graduate studies, and actually lived in hotels for four months.

104.     As a direct and legal result of Twitter's concealment, Plaintiff has also suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to personal and professional reputation

105.     Twitter's conduct was intentional, willful, and/or are taken in willful disregard of Plaintiff's 's rights. As such, Plaintiff seeks an award of exemplary and/or punitive damages against Twitter in a sum to be determined according to proof at trial.

## Eighth Cause of Action Against Twitter and Does 1-5 for Negligent Hiring, Supervision, or Retention of Employee

106.     Plaintiff repeats and repleads each allegation in Paragraphs 1-49 as though fully set forth herein.

107.     Twitter hired Alzabarah.

108.     Alzabarah became unfit and/or hazardous to perform the work for which Alzabarah was hired.

109.     Twitter knew or should have known that Alzabarah was or became unfit and/or hazardous to perform the work for which Alzabarah was hired and that this unfitness and/or hazard created a particular risk to others including Plaintiff.

110.     As a direct and legal result of Alzabarah's unfitness and/or hazard, Plaintiff has suffered loss of property and has incurred out-of-pocket expenses in excess of $75,000.   Plaintiff had to move out of his apartment, withdraw from his graduate studies, and actually lived in hotels for four months.

111.     As a direct and legal result of Alzabarah's unfitness and/or hazard, Plaintiff has also suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to personal and professional reputation.

112.     Twitter's negligence in hiring, supervising and/or retaining Alzabarah was a substantial factor in causing Plaintiff's harm.

## **PRAYER FOR RELIEF**

1.     Compensatory damages for all economic loss, including but not limited to loss of past or future income, to the extent allowed by law.

2.     General damages for pain, suffering, humiliation, and emotional distress to the extent allowed by law.

3.     Punitive or exemplary damages, in an amount sufficient to punish the defendant and to deter future similar misconduct, to the extent allowed by law.

4.     Injunctive and prospective relief as the Court may order to prevent further wrongful acts, to the extent allowed by law.

5.     The costs of litigation, including reasonable attorney's fees, to the extent allowed by law.

DATED:  October 18, 2019                RESPECTFULLY SUBMITTED

**KLEIMAN / RAJARAM**

By:    /s/ Mark Allen Kleiman, Esq.
          Mark Allen Kleiman, Esq.


**LAW OFFICES OF BEN GHARAGOZLI**
Ben Gharagozli, Esq.

1

## DEMAND FOR JURY TRIAL

2

Plaintiff demands a jury trial on all issues so triable.

3

4

DATED:  October 18, 2019          RESPECTFULLY SUBMITTED

5

**KLEIMAN / RAJARAM**

6

7

8

By:   /s/ Mark Allen Kleiman, Esq.

9

Mark Allen Kleiman, Esq.

10

**LAW OFFICES OF BEN GHARAGOZLI**
Ben Gharagozli, Esq.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Last Modified 19-Nov-2015 18:16 Arabian Standard Time

Printed

# Sample Scan: Austerity measures in Saudi Arabia

Contents

McKinsey & Company   1

# In order to gauge citizen sentiment on recent austerity measures announced in KSA, we closely analyzed data from twitter feed

## Understanding the terms used in our analysis



- The tool captures real-time sentiment
- Our tool is able to capture sample twitter feed data

- The maximum number of times content could appear to online users.

- The number of conversations divided by the number of mentions

- Key people who lead online conversations in their field

- Any activity made by users with the post. It can be a like, comment, or retweet

- Number of new posts captured

**Engagement rate**

**Impressions**

**Influencer**

**Twitter feed**

**Interaction**

**Mentions (Volume)**

# Overview of social media activity in KSA over a one month period post the announcement of austerity measures

## Volume and intensity of social media activity related to austerity

- Number of tweets > **20.31K**, involving > **82.5K** people
- Potential reach (impressions) > **1.54** million people
- Number of interactions (likes and retweets) > **86.3K**
- Number of conversations > **6.6K** i.e. engagement rate **>32.4%**

## Most commonly used words related to austerity

- Majority of discussions are discussing the issuance royal decrees



## Nature of sentiment related to austerity



Negative 22%

Positive 5

Neutral 74%

## Profile of social media users discussing austerity

Users

80%

Male Female Businesses

7% 13%

# Decrease of university allowances, was the most discussed topic related to austerity



## Top emerging themes

| Theme | Negative | Neutral | Positive | |
|---|---|---|---|---|
| Decreasing university allowance | 18% | 77% | 4% | 3.4K |
| Highway fees | 17% | 77% | 6% | 2.5K |
| Royal decrees | 14% | 81% | 5% | 2.1K |
| Salary advice/ discussion | 7% | 92% | 1% | 696 |

Negative / Positive / Neutral

## Deep dive: University allowance

- Number of tweets> **3.44K**, involving> **11.4K** people
- Potential reach (impressions) > **181.8 million** people
- Number of conversations > **772** i.e. engagement rate **>22.45%**

## Positive tweet

**Translation:** #UniAllowanceDecrease A Bedouin was told the price of loaf increased, and he states he will worship God regardless and God will provide as promised

## Negative tweet

**Translation:** #UniAllowanceDecrease. I would hope we decrease foreign aid to countries like Egypt that don't have war



Last Modified 11/12/2016 18:36 Arabian Standard Time   Printed

# The second most tweeted hashtag was #HighwayFeesIssuance with 2.5K tweets - ‏رسوم_الطرق_السريعة#

Social Media analysis 27-09-16 to 27-10-16

## Word cloud



**Negative**

- Most negative mentions are complaining about current street quality and traffic, therefore highway maintenance should precede the fees issued

**Translation:**
#HighwayFeesIssuance
The individuals who are responsible for our streets' current state should be prosecuted before the issuing the fees

17%

6% **Positive**

77% **Neutral**

**Translation:**
This is not austerity, this is a plan to remedy our high inflation and reduce it by over 40%
#HighwayFeesIssuance

- Economist with **41.6 K** followers discusses the topic of highway fees issuance

**Translation:**
Increasing revenue by issuing fees like this won't work unless there's a simultaneous decrease the millions wasted in the government.
#HighwayFeesIssuance

Last Modified 11/12/2016 18:36 Arabian Standard Time

Printed

# Female users have been more satirical regarding austerity, whereas male users have higher negative sentiment

**Sentiment of female users**

- Negative 19%
- Positive 4%
- Neutral 77%

- Majority of tweets are satirical, and the highest mentioned topic is the decrease of university allowances

**Nora Ahmad**
@Nora_Ahmad21 · 896 Followers

#تخفيض_المخصصات_الجامعية ٥٠٠ ريال من المخصصات.. يمكن الإيرادات المتوقعة في رؤية 2030 راح تطلع من جيوبنا

**Translation:** #UniAllowanceDecrease I guess the revenues projected in Vision 2030 is coming out of our pockets

**Breakdown of total users**

- Business 13%
- Female 7%
- Male 80%
- **82.5K** people

- High negative sentiment around austerity, most individuals stating austerity should begin with government spending not with citizen fees

@mon_el_mokhtar

الناس ملت من إجراءات التقشف الداخلية اللي راح تزيد الفقر، بس المساعدات الخارجية مستمرة في الزيادة!

**Translation:** People are tired of internal austerity measures that will increase poverty, but foreign aid keeps increasing!

**Sentiment of male users**

- Negative 21%
- Positive 6%
- Neutral 73%



# Discussion is declining in terms of tweets, however negative sentiment has been consistently high[1]

**Time series with volume (tweets) with sentiment**



**Deep dive: time series**

- The first quarter of October saw high discussion on austerity with over **9.8K tweets** in the span of four days
- Tweets throughout mid-October have decreased 20% in volume, however individuals in discussion are mostly negative about the austerity measures, stating that other spending (i.e project spending, foreign aid …,) should be have been decreased

Last Modified 11/12/2016 18:36 Arabian Standard Time   Printed

# Major influencers in Saudi driving discussion regarding austerity measures



| Theme | Followers | Interaction | Example |
|---|---|---|---|
| **Khalid AlAlkami** — ▪ Saudi writer, comments are mostly revolving around the Saudi economy  ▪ He also discusses different hot topics effecting the Saudi society  ▪ Wrote multiple negative tweets regarding austerity | 355.9 K | 4.45 K | **Translation:** Not objecting on decreasing spending, but decreasing corruption in its entirety should precede citizen's pockets |
| **Omar Abdulaziz** — ▪ Saudi influencer with high following, mainly uses Twitter and Snapchat  ▪ Omar has a multitude of negative tweets on topics such as austerity and the royal decrees | 182.65 K | 521 | **Translation:** Not a single Saudi high-level representative has addressed the #RoyalDecrees ! There should be honesty with the citizens, tell them the truth |
| **Ahmad** — ▪ Ahmed tweets mostly on economic topics as well as Saudi society hot topics  ▪ He has written 3 tweets that had over 877 likes and retweets | 144 K | 877 | **Translation:** Saudi is still negotiating an arms deal with BEA, according to BBC the contract is worth 40 billion GBP #Austerity |

# In addition to twitter, there is a high coverage of austerity measures on various news channels as well

**Coverage[1] of 'austerity' across various media channels**



| Channel | Value |
| --- | --- |
| Twitter | 2,030 |
| News | 1,066 |
| Blogs | 61 |
| Forums | 13 |

## Rationale

- According to Twitter's MENA sales manager, Saudis produce over **500K** tweets daily

- Based on statistics published in 2015, the total Saudi Arabian registered users are **316 million** Twitter users

**News: Okaz newspaper**

"Even if members of the society reduce their spending, there will still be difficulty managing with the decreased salaries. I know many individuals who have never known luxury but have little to no savings at month's end. They can barely afford their current expenses but they are most effected."

**-Khalid AlSulaiman**



**News: Al-Jazirah newspaper**

"It's highly unlikely that the Saudi citizen will transform from a lazy consumer to a productive frugal individual; unless motivated or compelled to do so. We should welcome the austerity measures!"

**-Jasser AlHarbash**




1 Social Media analysis 27-09-16 to 27-10-16; number of tweets/ articles etc.
SOURCE:   Alyawm, BBC

# EXHIBIT B



‹ Inbox    **4 Messages**    ⌃ ⌄
Important information from Twitter a...

➡ **Twitter**                        2016-02-17    T
**To:** Omar Alzahrani              Details

Dear @oamaz7,

We are writing to let you know that we recently
learned about - and immediately fixed - a bug that
affected our password recovery systems for about
24 hours last week. The bug had the potential to
expose the email address and phone number
associated with a small number of accounts.

In our investigation, we discovered that the email
address and phone number linked to your account
was viewed by another account and we wanted to
alert you as soon as possible.

We take these incidents very seriously, and we're
sorry this occurred. Any user that we find to have
exploited the bug to access another account's
information will be permanently suspended, and we
will also be engaging law enforcement as
appropriate so they may conduct a thorough
investigation and bring charges as warranted.



While the viewable information alone can't directly be used to access your account in any way, we do recommend you take the following steps to further secure your Twitter account:

- **Require additional information be entered in order to initiate a password reset.** This feature will require that you enter your account email address or mobile number, in addition to your username, in order to send a password reset email or SMS/text.
- **Be sure to use a strong password** – at least 10 (but more is better) characters and a mixture of upper and lowercase letters, numbers, and symbols – that you are not using for any other accounts or sites.
- **Consider using login verification.** Instead of relying on just a password, login verification introduces a second check to make sure that you and only you can access your Twitter account.
- **Check the Applications tab** at http://twitter.com/settings/applications and revoke the access privileges of any third party applications that you do not recognize.

    



of relying on just a password, login verification introduces a second check to make sure that you and only you can access your Twitter account.

- **Check the Applications tab** at http://twitter.com/settings/applications and revoke the access privileges of any third party applications that you do not recognize.
- **If you'd like to review logins** for your account you can do that at the Twitter data dashboard in your settings.

For more information about making your Twitter and other Internet accounts more secure, read our Help Center and the FTC's guide on passwords.

- The Twitter security team

**Help**

Twitter, Inc. 1355 Market Street, Suite 900
San Francisco, CA 94103

See More