Mark A. Kleiman (SBN 115919)
KLEIMAN / RAJARAM
2525 Main Street, Suite 204
Santa Monica, CA 90405
Telephone: (310) 392-5455
Facsimile:  (310) 306-8491
Email: mkleiman@quitam.org

Ben Gharagozli (SBN 272302)
Law Offices of Ben Gharagozli
2525 Main Street, Suite 204
Santa Monica, CA 90405
Telephone: (661) 607-4665
Facsimile:  (855) 628-5517
Email: ben.gharagozli@gmail.com

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

OMAR ABDULAZIZ,                                )   Case No.: 3:19 CV-06694-LB
                                               )
                    Plaintiff,                 )   ~~FIRST~~SECOND **AMENDED**
              v.                               )   **COMPLAINT AND DEMAND FOR**
                                               )   **JURY TRIAL**
TWITTER, Inc..; McKINSEY & Co.; and            )
DOES 1-10; inclusive,                          )
                                               )
                    Defendants,                )
                                               )
_____              )

"We fell behind, both in our protections against social engineering of our
employees and restrictions on our internal tools" Twitter CEO, Jack Dorsey
acknowledging past missteps, 2020."

_____
~~FIRST~~SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB



# TABLE OF CONTENTS

**Page**

PARTIES ........................................................................................................1

JURISDICTION ..............................................................................................2

General Jurisdiction over Twitter ....................................................................2

General Jurisdiction Over McKinsey ...............................................................2

Specific Jurisdiction Over McKinsey (Forum-Related Activities
Giving Rise to Plaintiff's Claim) .....................................................................3

VENUE ...........................................................................................................4

FACTUAL BACKGROUND ...........................................................................4

    Twitter...................................................................................................5

    Twitter Knew or Should Have Known that the Employees Became
    Unfit and Hazardous and Unfit and that This Created a Particular Risk to
    Others, Including Plaintiff .............................................................................6

    Reasons This Was Foreseeable to Twitter ....................................................7

    Summary of Negligence Allegations against Twitter.....................................8

    The Predictability of Attack.........................................................................9

    The Detectability of the Insider Attack at Twitter........................................11

    Twitter's Respondeat Superior Liability for the Theft ..................................18

    How the Twitter Inside Job Harmed Plaintiff...............................................19

    Twitter's Refusal to Repudiate the Data Theft Impliedly Ratified
    the Thieves' Conduct...................................................................................22

    Twitter's  ~~This is~~December 11, 2015 Notification Went to Only Some of the Victims
    Plaintiff and Another Leading Saudi Dissident Were Strangely Excluded.....................25

    The December 2015 Notice Was False and Misleading..................................26

~~FIRST~~SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19‑CV‑06694‑LB

**Formatted:** Highlight

**Formatted:** Right:  0.26", Line spacing:  single, Widow/Orphan control, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

**Formatted:** Font: Not Bold, No underline, Highlight

**Formatted:** Line spacing:  single

**Formatted:** Page Number, Font: 9 pt

**Formatted:** Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around



Twitter's' Notification Process Violated the UCL and Twitter's Ongoing Disinterest in Security Makes This Certain to Recur ................................................ 26

Plaintiff's Claims Against Twitter are Timely ................................................ 27

McKinsey's Motive for Its Extreme and Outrageous Conduct ................................................ 28

It Was Foreseeable That Vocal Opponents of MBS's Plan Would be in Mortal Danger, Yet McKinsey Recklessly Disregarded This Risk for Money ................................................ 30

Despite Full Knowledge of These Risks, McKinsey Prepared a Report Which Analyzed and Identified the Most Influential Opponents of MBS' Vital Policies ................................................ 31

The Predictable Consequences of Defendants' Misconduct ................................................ 32

First Cause of Action Against Twitter, Inc., and Does 1-5 for Violation of the Stored Communications Act, 18 U.S.C. §2701, et. seq. ................................................ 39

Second Cause of Action Against Twitter and Does 1-5 for Violation of California Business & Professions Code §17200, et. seq. ................................................ 40

Third Cause of Action Against Twitter and Does 1-5 for Invasion of Privacy ................................................ 42

Fourth Cause of Action Against McKinsey & Co. and Does 6-10 for Intentional Infliction of Emotional Distress ................................................ 43

Fifth Cause of Action Against Twitter and Does 1-5 for Intentional Misrepresentation ................................................ 43

Sixth Cause of Action Against Twitter and Does 1-5 for Negligent Misrepresentation ................................................ 45

Seventh Cause of Action Against Twitter and Does 1-5 for Concealment ................................................ 46

Eighth Cause of Action Against Twitter and Does 1-5 for Negligent Hiring, Supervision, or Retention of Employee ................................................ 47

Ninth Cause of Action Against Twitter and Does 1-5 for Negligence ................................................ 48

PRAYER FOR RELIEF ................................................ 49

DEMAND FOR JURY TRIAL ................................................ 50

FIRST SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 3:19 CV-06694-LB

1.   This an action to vindicate the rights of Omar Abdulaziz, a political refugee who has been granted political asylum in Canada from the despotic regime in the Kingdom of Saudi Arabia ("KSA").  Because of the tremendous wealth of key figures in KSA, major corporations, including Twitter, Inc. and McKinsey & Co., have enabled, collaborated with, aided and abetted, and turned a blind eye to KSA's efforts to suppress, torture, falsely imprison, terrorize, and murder dissenters both within Saudi Arabia and around the world. Twitter, Inc., and McKinsey & Co. have for monetary gain, exposed him, his family members, friends and political associates to imprisonment, torture, and even death.

**<u>PARTIES</u>**

2.   —Plaintiff Omar Abdulaziz (hereinafter "Plaintiff") is a graduate student and political dissident who resides in and has been granted asylum in Canada because he faced likely persecution were he to return to his native country, Saudi Arabia.

3.   —Defendant Twitter, Inc., (hereinafter "Twitter") is incorporated in Delaware with its headquarters in San Francisco, California.  In 2011 Saudi Prince Alwaleed Bin Talal purchased $300 million worth of stock in Twitter.  In 2015 Bin Talal made an additional investment, owning 5.2% of the company, more than Twitter's founder and CEO.  A January 29, 2018 article in the British newspaper, *The Daily Mail* reported that after being imprisoned and perhaps tortured by KSA, Bin Talal signed over many of his assets, to Crown Prince Mohammed Bin Salman (hereinafter "MBS").  Per *The Daily Mail*, the Trump Administration allegedly made a deal with MBS allowing him to seize control of these assets and those of other princes, so long as the assets remained in the United States.  Plaintiff is informed and believes and based thereon alleges that since late 2017 or January of 2018, MBS has exercised control over more Twitter stock than is owned by Twitter's founder, Jack Dorsey.

4.   —Defendant McKinsey & Co. (hereinafter "McKinsey") describes itself as an incorporated partnership established in the State of New York.  It does have offices in and transacts business in San Francisco, California and Redwood City, California.  McKinsey has at least sixty (60) partners in California.  Plaintiff is informed and believes and based

---

~~FIRST~~SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

thereon alleges that the ratio of employees to partners is at least 7 to 1, meaning that McKinsey employs at least 420 professionals, paraprofessionals, and support staff in the State of California.  Plaintiff is informed and believes and based thereon alleges that the average income for a McKinsey partner is between $500,000 and $1,000,000 per year.

5.   The true identity of each defendant denominated as a "Doe" is unknown to plaintiff at this time, so said defendants are sued in this capacity.  As each such defendant becomes known to Plaintiff, he shall seek leave to amend this Complaint to set forth that defendant's true identity.

**<u>JURISDICTION</u>**

**<u>General Jurisdiction over Twitter</u>**

6.   Twitter's home office is in San Francisco, California, within this judicial district.

7.   Jurisdiction is proper because this action includes claims that Twitter violated or ratified its employee's violation of the Stored Communications Act, 18 U.S.C. §2701, *et. seq.*

**General Jurisdiction Over McKinsey**

8.   McKinsey has 78 partners living and working in California, 47% more than it has in New York.  McKinsey's San Francisco office is less than one mile from the courthouse in which this action is filed.

9.   Locus of control of key corporate programs.

a.   Gary Pinkus, "Chairman of North America".  According to Foreign Agents Registration Act filings, Mr. Pinkus, between December 2015 and June 2016, aided the committee appointed by the Saudi Council of Economic and Development Affairs (CEDA) in a project in respect of the US-Saudi partnership.  While based in the United States (specifically San Francisco, CA), Mr. Pinkus supported certain aspects of the project with a focus on arranging and supporting meetings in the United States.  Further, on information and belief,

Mr. Pinkus was the director of the McKinsey PowerPoint Project and was running it from San Francisco.

10.  McKinsey's primary service is one of information and advice.  McKinsey has a motto of "One McKinsey" whereby when a client hires the firm, they hire the entire worldwide network.  They have a distributed presence worldwide and its employees work on projects without regard to either their location or the locus of the project.  Although McKinsey provides presentations to clients, the preparation of those presentations is a task that is distributed to McKinsey people all over the world.

**Specific Jurisdiction Over McKinsey (Forum-Related Activities**

**Giving Rise to Plaintiff's Claim)**

11.  Here, the command center of the McKinsey PowerPoint Project was in San Francisco and the Bay Area.  This is based on the role of three San Francisco and Bay Area-based McKinsey partners in particular: (1) James Manyika; (2) Bob Sternfels; (3) Hugo Sarrazin.  Plaintiff is informed and believes and thereon alleges that all four of the aforementioned McKinsey partners continue to reside in San Francisco and the Bay Area.

a.  James Manyika's role as the "Chairman and Director, McKinsey Global Institute" is significant. McKinsey has conceded in filings with this Court that the McKinsey Global Institute prepared the McKinsey powerpoint at issue in this action.

b.  Bob Sternfels, who sits on McKinsey's Board of Directors and "led [McKinsey's] new innovations growing these capabilities to approximately half of the firm's revenue today."  Mr. Sternfels is the Global head of client capabilities for McKinsey and the ultimate supervisor of Rupinder Kochhar, who is the Director of client capabilities in the Middle East and head of the Middle East Knowledge Hub.  Mr. Sternfels is also the ultimate supervisor of Vikram Dastidar, who, according to McKinsey's filings in the instant action, is a research manager and the manager of McKinsey's Saudi Knowledge Hub, which produced the McKinsey powerpoint.

Formatted: Line spacing:  single

Formatted: Page Number, Font: 9 pt

Formatted: Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around

c.   Hugo Sarrazin is the cofounder and global leader/head of McKinsey Digital Labs.  On information and belief, McKinsey Digital Labs was in charge of preparing the McKinsey powerpoint report at issue in this action.  Mr. Sarrazin, who is based in the Silicon Valley, would oversee Enrico Benni in the Middle East, who is the head of technology in the tech team for McKinsey in the Middle East Region.  Mr. Sarrazin would have overseen any project that concerned a technique called sentiment analysis.  On information and belief, McKinsey utilized sentiment analysis in preparing the McKinsey powerpoint report at issue in this action.

12. To the extent that the conduct giving rise to this action also implicates state law claims, this Court is requested to exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. §1367.  Alternatively, diversity jurisdiction exists pursuant to 28 U.S.C. §1332.

**VENUE**

13. Venue is proper in this district under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district.

**FACTUAL ALLEGATIONSBACKGROUND**

14.  In 2009 Plaintiff moved from Saudi Arabia to Canada after he was admitted to study at a Canadian university.  While he was in Montreal as a student, Plaintiff, who is talented in the use of social media, would discuss the internal political affairs of KSA.  Plaintiff would provide political commentary using Twitter and other media websites.  His main contribution was criticism of the way the KSA regime ran Saudi Arabia, criticism of the royal family in KSA, corruption of KSA, and the foreign policy of KSA.  Plaintiff was especially vocal about the grave violations of human rights in KSA, KSA's disregard for Saudi citizens, and their rights and freedoms.

15.  KSA has one of the worst human rights records in the world. The State Department's 2014 Human Rights Report on Saudi Arabia summarized the situation: "[H]uman rights problems reported included abuses of detainees; overcrowding in prisons and

detention centers; investigating, detaining, prosecuting, and sentencing lawyers, human rights activists, and antigovernment reformists; holding political prisoners; denial of due process; arbitrary arrest and detention; and arbitrary interference with privacy, home, and correspondence.  Violence against women, trafficking in persons, and discrimination based on gender, religion, sect, race, and ethnicity were common.  Lack of government transparency and access made it difficult to assess the magnitude of many reported human rights problems."

"The government reportedly arrested and detained multiple persons during the year, refusing for extended periods in some cases to acknowledge the detention or to provide information about an individual's whereabouts."

11.  In fact, the best that the State Department could say in its 2014 report was that "[i]n contrast with previous years, there were no confirmed reports of torture by government officials."  By way of example, the Human Rights Report noted: "In 2011 security officials reportedly took human rights activist Mekhlef bin Daham al-Shammary from his prison cell at the Dammam General Prison and allegedly poured an antiseptic cleaning liquid down his throat, resulting in his hospitalization."  Al-Shammary was arrested "after he commented on Twitter in support of Shia-Sunni reconciliation and attended a Shia religious gathering."

12.  Another Shia cleric, Tawfiq al-Aamer was arrested in 2011 for criticizing the government.  In 2012 he was charged with calling for political change, libeling the country's religious scholars, and collecting illegal religious donations, among other offenses.  The Specialized Criminal Court ("SCC"), ostensibly established to prosecute terrorists, sentenced al-Aamer to an eight-year prison term, a subsequent 10-year travel ban, and a ban on publicly delivering sermons or speeches.

13.  This brutal suppression is not just confined to religious minorities.  On July 6, the SCC sentenced lawyer and human rights activist Waleed Abu Al-Khair to a 15-year prison term, a subsequent 15-year international travel ban, and a 200,000 riyal ($53,300) fine for activities related to his human rights work. These activities included public calls for reform, criticisms of government policies and officials, and his role in founding an unlicensed NGO,

Formatted: Line spacing:  single

Formatted: Page Number, Font: 9 pt

Formatted: Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around

1    the Monitor for Human Rights in Saudi Arabia.

2        14.  On October 27, 2014 a court sentenced lawyer Abdulrahman al-Subaihi to eight

3    years in prison and lawyers Bander al-Nogaithan and Abdulrahman al-Rumaih to five years in



**Formatted:** Line spacing:  single

**Formatted:** Page Number, Font: 9 pt

**Formatted:** Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around

1   ~~prison for "undermining and slandering the judicial system" via critical tweets and for~~
2   ~~"disobeying the ruler."~~

3          ~~15.  Saudi authorities retaliated against Plaintiff for his political activities by harassing~~
4   ~~him so severely that he applied for asylum in Canada on or about December 31, 2013.  The~~
5   ~~application was approved on February 21, 2014.~~

6          ~~16.  In response to this political persecution, Plaintiff increased his political activities as~~
7   ~~a harsh critic of the rule of KSA, and he was especially popular among the youth in Saudi~~
8   ~~Arabia. Today Plaintiff has over 400,000 followers on Twitter and the over 163,000~~
9   ~~subscribers on YouTube channel he runs and on which he broadcasts his political views. In~~
10  ~~addition, Plaintiff contributes to and manages, together with other pro-democracy activities, a~~
11  ~~number of websites, Twitter accounts and YouTube channels.  However, in 2015, he had~~
12  ~~fewer than 200,000 Twitter followers and even fewer subscribers to his YouTube channel.~~

13          16. - Plaintiff was also a close ally of Jamal Khashoggi who was murdered in the
14  ~~17.~~    Saudi Consulate in Istanbul in the beginning of October 2018 by a group of assassins
15  related to the security and intelligence services of KSA.  After Mr. Khashoggi left Saudi Arabia
16  and moved to the United States, a friendship developed between Plaintiff and Mr. Khashoggi.
17  The two started to cooperate on a range of political activities with the objective of educating the
18  public in Saudi Arabia. The political partnership became stronger and the two cooperated on
19  various projects.  However, most of the projects did not materialize because this partnership and
20  friendship was suddenly cut short when Mr. Khashoggi was brutally murdered.  The CIA has
21  concluded that Crown Prince Mohammad Bin Salman ("MBS") ordered Mr. Khashoggi's
22  assassination.

23          ~~18.  In December 2016 or January 2017, McKinsey singled Plaintiff out to the agents of~~
24  ~~Prince Mohammed bin Salman by identifying Plaintiff as one of the top three voices shaping~~
25  ~~public discussion about controversial austerity measures.  The other two individuals were Mr.~~
26  ~~Khaled Al-Alkami and an individual named "Ahmad."  After they were identified, Alkami was~~

27
28

Formatted: Right:  0.2",  No bullets or numbering, Widow/Orphan control, Tab stops: Not at  0.81"

Formatted: Line spacing:  single

Formatted: Page Number, Font: 9 pt

Formatted: Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around

1  imprisoned and "Ahmad" disappeared. A true and accurate copy of what Plaintiff believes is

2  the McKinsey's report is attached as Exhibit A.

3      19. McKinsey's report was based on analysis of data from Twitter. One of Twitter's

4  major sources of revenue is selling data to third parties who wish to mine it for analytical

5  purposes. Plaintiff is informed and believes and thereon alleges that Twitter and McKinsey

6  entered into a contract whereby Twitter would license or sell to McKinsey and McKinsey

7  would buy or license from Twitter internal data from Twitter's database that is otherwise

8  unavailable to the public. As Twitter is headquartered in California, Plaintiff is informed and

9  believes and thereon alleges that the contract was entered into in California and that individuals

10  employed by or otherwise contracted by McKinsey in California worked on, were involved or

11  contributed to at least this aspect of McKinsey's report.

12      20. Plaintiff is informed and believes and thereon alleges that given the level of detail

13  in the McKinsey report furnished to MBS (described below), that McKinsey purchased or

14  licensed internal data from Twitter to prepare the McKinsey report.

15  21. McKinsey has played a critical role in MBS's drive to consolidate power in KSA.

16  McKinsey has earned many millions of dollars in projects in Saudi Arabia. Between 2010 and

17  2016, McKinsey's project portfolio in Saudi Arabia has grown exponentially. McKinsey has

18  directly advised government agencies in KSA to the point that KSA's Ministry of Planning has

19  acquired the nickname "Ministry of McKinsey" by some Saudis, including KSA's royal court.

20  In 2017, McKinsey purchased a politically connected Saudi consultancy, which added 140 more

21  employees to McKinsey's already 300 employees in the region.

22  22. McKinsey has maintained an office in Riyadh, the capital and main financial hub of Saudi

23  Arabia. The company's website boasts that its "Saudi Arabia Practice helps Saudi leaders."

24      23. The Brookings Institute attributes "the Kingdom's new economic direction" and a

25  major government cabinet reshuffling of high ranking government ministers to McKinsey.

26  MBS himself has admitted that "McKinsey participates with us in many studies." McKinsey

27  prepared a December 2015 report entitled "Moving Saudi Arabia's Economy Beyond Oil."

28

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 3:19-CV-06694-LB

That December 2015¹ report outlines an ambitious blueprint for KSA's economic transformation and diversification away from oil.  In what the Brookings Institute refers to as a "glaring omission," the December 2015 report fails to sufficiently explain how KSA "will be able to change the mindset of everyday Saudi Arabia citizens, who have long been accustomed to state largesse that included fuel subsidies, loans, free land, and public sector jobs."  The Brookings Institute goes on to insist that this is a "key issue" and questions how everyday citizens in Saudi Arabia will react to the reforms, referencing public discontent to a number of higher utility prices, which led to King Salman firing the water minister to appease the public.  McKinsey's PowerPoint report, which identified Plaintiff as one of the three loudest voices of discontent against KSA's policies sought to "gauge citizen sentiment on recent austerity measures announced in KSA" by closely analyzing "data from twitter feed."  In other words, McKinsey's PowerPoint presentation filled a crucial blank space in how KSA would be able to pursue controversial economic reforms by identifying those who were spreading the most criticism of such reforms.

24.  On or about June 29, 2015, Saud Al Qahtani then a Minister to the Royal Court, emailed The Hacking Company to ask about its service.  Shortly after that, Khashoggi and other Saudi dissidents were subjected to massive Twitter attacks.

**The McKinsey Report**

25.  Since at least December of 2015, it was common knowledge in circles knowledgeable about KSA affairs that very notable nonviolent dissidents were being kidnapped from foreign countries and forcibly taken to Saudi Arabia where, after being seized by government forces, they were never heard from again.

---

¹ The Brookings Institute argues that the December 2015 report inspired MBS's report entitled "Saudi Arabia's Vision 2030".

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

26.  The 2016 Human Rights Report from the U.S. State Department reported that judges from KSA's SCC "were implicitly instructed to issue harsh sentences against human rights activists, reformers, journalists, and dissidents not engaged in violent activities."

27.  In January of 2016 Amnesty International reported that the sister of jailed blogger Raif Badawi was imprisoned in yet a further attempt to intimidate activists.

28.  Despite (or in furtherance of) this drumbeat of brutality and intimidation, in December 2016, McKinsey prepared a report that identified three of the most influential individuals on Twitter with respect to criticism of KSA's policies.  Plaintiff was one of these individuals.  On information and belief, McKinsey subsequently gave or displayed the report to agents of MBS and/or to MBS himself.

29.  Before McKinsey published this report, KSA was infamous for suppressing both critical political speech, sentencing numerous writers and dissidents to death.

30.  Before McKinsey published the report, Plaintiff was one of many dissidents who protested the corruption and human rights violations of KSA.  After the publication of McKinsey's report, Plaintiff became one of three.  By publishing this report and furnishing it to MBS, McKinsey effectively put a target on Plaintiff's back.

31.  The McKinsey Report identified three "major influencers", Plaintiff, Khalid AlAlkami, and "Ahmad".  After the report's distribution to MBS and/or his associates, AlAKami was imprisoned, Plaintiff was hacked and he, his family, friends, associates, were harassed, and "Ahmad" has disappeared — or has been disappeared.  Another dissenter whose tweet was merely quoted as an example of "highly negative sentiment", Aesa al Nukhifi, was imprisoned on March 24, 2017.

## Twitter

32. On information and belief, McKinsey is still working with MBS and conducting training at his MISK Foundation.

33.  At the drafting of the McKinsey report, it was foreseeable that such information would be used to target dissidents at least in part because KSA's abysmal human rights record

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

~~FIRST~~SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 3:19 CV-06694-LB

**Formatted:** Line spacing:  single

**Formatted:** Page Number, Font: 9 pt

**Formatted:** Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph,  Wrap Around

and utter contempt for democratic values, political criticism and freedom of expression was well known.

**Twitter's Flawed Security and It's Misleading of Plaintiff**

17. Twitter informed the Securities and Exchange Commission that in 2015 it had nearly 3,900 employees and generated over $2.2 billion of yearly revenue, more than enough to put in place adequate safeguards to protect its users.  Rather than maintain enough staff to protect its users, Twitter laid off 336 employees in October 15, 2015 upon Mr. Dorsey's return as CEO.  This constituted 8% of Twitter's workforce.  Twitter's share value increased after the layoffs.

In SEC filings, Twitter's main concern is user expansion.

18.  Twitter allowed two spies to operate without interference.  Twitter either (1) willfully ignoring all of this because it did not want to upset KSA if it did not have to (this opportunity vanished when western intelligence agencies formally notified Twitter of the spies) or (2) did not want to invest in having human beings monitor alerts.  Due to established industry standards, Twitter had infrastructure that would have set off alerts upon a Twitter employee's unauthorized access to private user data and information.

**Twitter Knew or Should Have Known that the Employees Became Unfit and Hazardous and Unfit and that This Created a Particular Risk to Others, Including Plaintiff**

19.  Twitter anticipated inside jobs whereby employees would, for a variety of reasons, access or attempt to access private user data.  Because of this, Twitter had a "Playbook," which outlined the policies Twitter employees must obey as part of their employment.  In 2013, both Abouammo and Alzabarah agreed to abide by the Twitter "Playbook."  In pertinent part, the Twitter "Playbook" prohibited Abouammo and Alzabarah from engaging in outside employment or consulting "or any other business activity that would create a conflict of interest with" Twitter.  Twitter's 2013 Employee Invention Assignment and Confidentiality Agreements with Abouammo and Alzabarah affirmed "a relationship of confidence and trust" between

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 3:19 CV-06694-LB

Twitter and each employee "with respect to any information of a confidential or secret nature that may be disclosed to [them] by [Twitter]...that relates to the business of [Twitter]. It defined "Proprietary Information" to include "customer lists and data." The Employee Invention Assignment and Confidentiality Agreement further required Abouammo and Alzabarah to "keep and hold all such Proprietary Information in strict confidence and trust." As employees, Abouammo and Alzabarah promised to "keep and hold all such Proprietary Information in strict confidence and trust." They promised to "not use or disclose any Proprietary Information without the prior written consent of [Twitter]." It forbade them from using any Twitter information for any other business or employment.

20. Further, Twitter had a "Gift Policy" during Abouammo and Alzabarah's employment that stated: "[f]or gifts exceeding $100 in value, bring the gift to the attention of both your manager and VP of HR before returning to sender."

**Reasons This Was Foreseeable to Twitter**

21. Known as the "Arab Spring", December 2010 through 2012 saw a wave of popular 35. protests in the Arab world against autocratic governments in the region. According to numerous social scientists and regional experts and analysts familiar with the region, social media in general and Twitter in particular was at least one of the facilitators behind the "Arab Spring." Autocratic governments, including KSA have recognized this. Since the Arab Spring, autocratic governments such as the KSA have clamped down on activists and invested heavily in state surveillance capabilities.

22. Twitter has also been used as a platform for those seeking the overthrow and/or 36. reform of autocratic regimes outside of the Arab world, including Moldova, China and Ukraine.

23. Twitter is the 5th most frequently visited site in Saudi Arabia. https://www.gogulf.com/social-media-saudi-arabia/ 2016 0118 last visited 2020 0824.

24.  Because of the use which activists have made of Twitter, authoritarian regimes in 37. the region and throughout the world have increasingly surveilled those activists' Twitter accounts in an effort to disrupt and silence them.

25. - This is especially true for Saudi Arabia.  Because traditional forms of public speech 38. are so thoroughly repressed, in the words of Plaintiff, "Twitter is our Parliament."

26. - Since at least 2009 tech companies have been targets of spying attempts by 39. authoritarian regimes. In January of 2010 Google revealed that between mid-2009 and December 2009 it had been targeted by hackers interested in targeting the accounts of Chinese dissidents.  Within months the attack had been traced to the Chinese government.  Suspecting an insider attack, Google suspended and transferred many of its Google suspected that state actors (in this case the Chinese government) had organized an inside attack using Google's own employees in mainland China.

40.  Google was not alone in experiencing insider attacks.  In 2010 Chelsea Manning exploited insider access to search and leak extensive amounts of classified electronic intelligence material.  In June of 2013 the Justice Department unsealed a criminal complaint charging Edward Snowden with theft of government property he obtained while employed by a government contractor.

27. - More efficient for a foreign intelligence service to bribe or coerce an employee to do an inside job than to spend tens of millions to try to hack Twitter.

28.  According to Frank Montoya, the FBI's former Director of National Counterintelligence Executive, the Bureau has repeatedly warned social media platform of this well before 2015. On information and belief, Twitter, which had over 100 million users by 2012, was among the platforms so warned.

29.  According to Alex Holden, Chief Executive Officer of Hold Security, new cases of data abuse that occur every month point to carelessness among companies.

30.  Twitter itself had been repeatedly hacked.  On July 4, 2011 Fox News reported that

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19-CV-06694-LB

41. its Twitter feed had been hacked to falsely report that President Obama had been killed. On February 1, 2013 Twitter acknowledged that up to a quarter of a million user accounts had been hacked. On April 23, 2013 Associated Press' Twitter account was hacked by the Syrian Electronic Army to falsely report that there had been two explosions at the White House, and that President Obama had been injured. The same group took over numerous Twitter domains in August 2013.

31. By the time Twitter hired Alzabarah on or about August of 2013, it had abundant 42. notice that there was a clear and present threat of insiders being used to illegally access confidential data and that authoritarian governments such as KSA would be interested in using that data to help them target dissidents.

32. On or about June 2011, al-Qahtani publicly sought to purchase tools to ban people from Twitter or freeze their accounts.

33. On information and belief Twitter's Board of Directors was warned of the danger posed by broad access to user accounts by employees and the dangers associated with such access before Plaintiff's data was stolen and furnished to KSA by Twitter employees.

**Summary of Negligence Allegations against Twitter**

34. Twitter negligently hires, trained, supervised, its employees. Twitter negligently failed to observe and control new employees it had put in risky positions and had given great trust and authority to. Twitter negligently failed to restrict access to user data by (a) limiting the persons who had access; and/or (b) limiting the extent-duration of the access.

35. Twitter negligently failed to design, construct, implement safeguards with adequate audits and alerts.

36. Twitter negligently failed to adequately warn its users who were affected by the inside job. Although Twitter claim sit sent a notice on December 11, 2015, that notice was defective because it was vague and lacked material information it knew users would be interested to know (it did not indicate that it was an inside job, that Saudi Arabia was the state sponsor, that

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19-CV-06694-LB

the victims were critics of KSA).  Further, it merely stated that the users "may have" been
targeted when in fact, Twitter had no reason to doubt that users were indeed targeted.

<center><b>The Predictability of Attack</b></center>

37.  On November 3, 2013 Twitter hired Ahmad Abouammo as Media Partnerships
43.  Manager responsible for the Middle East and North Africa ("MENA") region.  His duties
included helping "notable" accounts of public interest, brands, journalists, and celebrities for the
MENA region with content, Twitter strategy, and sharing best practices.

38.  Plaintiff is informed and believes and thereon alleges that when an employee
44.  joins Twitter, he or she is supposed to apply for access to certain accounts.  Grants of
access depend upon the team of which the employee is a member.

39.  Despite the sensitivity of the positions Alzabarah and Abouammo held given
45.  political repression in the KSA and the very large number of Saudi reformers, dissidents
and activists who relied upon Twitter as a platform, Plaintiff is informed and believes and based
thereon alleges that Twitter made little or no effort to have an actual human security officer
review or monitor the activities of Twitter employees in sensitive positions.  The result of this
was that although there were alerts when Abouammo and Alzabarah accessed and/or attempted
to access private user data they were not authorized to access and had no legitimate reason to
access, the alert fell on deaf ears and no remedial action would be taken to either stop the
unauthorized access or prevent unauthorized access.

40.  On June 13, 2014 KSA official emails Abouammo with request to verify a Saudi Royal Family member's twitter account.  On June 14, 2014, the KSA official requests Abouammo's contact information.  The same day, Abouammo provides his Twitter and personal contact information to the KSA official.

41.  On information and belief, at all relevant times, Twitter does did not have a practice 46. or policy of periodically investigating such employees to determine whether they pose a danger to the privacy of Twitter's users.  On information and belief, at all relevant times, Twitter did not have a practice or policy of periodically investigating whether employees were accessing or had accessed private user data without authorization in violation of the Twitter Playbook.

42. – While Abouammo was at Twitter, he knew and socialized with Alzabarah.  In 47. April of 2014, Abouammo was assigned the task of helping a public relations firm, which worked for KSA to verify a newscaster's Twitter account.  Abouammo then asked the public relations firm what else he could do to be of service to KSA.

43. - Al-Qahtani was hired by the Chief of the Royal Court in Saudi Arabia to protect 48. the KSA's reputation on-line by means of an "electronic army" suppressing adverse social media content.  He was officially appointed an Advisor to the Royal Court in KSA in 2012 and given the rank of Minister in 2015.  In 2018, after the murder and dismemberment of Jamal Khashoggi, al-Qahtani was relieved of his official position.

44. - In June 2014, al-Qahtani began cultivating Twitter employees, and told 49. Abouammo that he worked directly for MBS.

45. - In November of 2014, al-Qahtani arranged an in-person meeting in London at a 50. Twitter global media summit.  During Abouammo's visit to London he met with Ahmed Al-Jabreen, in a face-to-face meeting, told Abouammo that he was advising a "very important" member of the Royal Family.

46. - Al-Jabreen founded a Saudi technology company, Samaat, which has ongoing

51. business relationships with MISK, which is an MBS-controlled multi-billion dollar foundation, which later hired Alzabarah as its CEO.

47. On or about November 20, 2014, when Al Jabreen and Abouammo had both 52. returned to the United States, they met in front of the Twitter offices in San Francisco, and remained outside of the offices for a private meeting.

48. On or about November 20, 2014, Al Jabreen posted a photo of himself and 53. Abouammo in front of Twitter's headquarters.

49. On December 5, 2014, al-Qahtani met Abouammo in London and gave him a 54. luxury Hublot watch valued at over $25,000.

50. The gift of this watch was just the first of many transactions. Abouammo 55. ultimately received at least $300,000 from KSA. In doing so, Abouammo violated the Twitter Playbook. Plaintiff is informed and believes and thereon alleges that the purpose of the Twitter Playbook's gift policy is at least in part, designed to prevent Twitter employees from being bribed into performing inside jobs for outside entities. However, because Twitter lacked the proper safeguards in place to actually investigate Abouammo, Twitter did not properly address the issue and hold Abouammo accountable.

51. In December 2014, Abouammo began accessing private Twitter data useful to 56. KSA often at the direct request of Al-Qahtani. On July 9, 2015,

**The Detectability of the Insider Attack at Twitter**

52. On December 12, 2014 Abouammo began accessing private and confidential 57. account data from the Twitter account operated by a London-based Saudi whistle blower, Mujtahid ibn Harith ibn Hamam ( "Mujtahid"). Abouammo also accessed Mujtahid's data on January 5, 2015, January 27, 2015, February 4, 2015, February 7, 2015, February 18, 2015, and February 24, 2015. Plaintiff is informed and believes and based thereon alleges that Abouammo's illicit viewing of Mujtahid's direct messages included private communications to and from Plaintiff. None of this was detected by Twitter in a timely manner. Despite the alerts

FIRST SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

that were sounded in Twitter's infrastructure due to this unauthorized access of private user data, Twitter took no remedial action in response to the unauthorized access.

53.   At all times material hereto, Twitter's practice was to store users' direct messages for purposes of backup protection.  In fact, a computer researcher reported in 2019 that "Twitter retains direct messages for years, including messages you and others have deleted, but also data ~~sent to and from accounts that have been deactivated and suspended.~~" sent to and from accounts that have been deactivated and suspended."

54.   On February 16, 2015, al-Qahtani called Abouammo three times.  Abouammo introduced Alzabarah to Al Jabreen.  On that same day Al Jabreen called Alzabarah.

55.  While Abouammo and Alzabarah were employed at Twitter, there were certain established industry standards with respect to service providers (including Twitter) that stored private user data.  Among other things, such industry standards required a strict process of monitoring for anomalous system activity, authorized or unauthorized user access incidents (whether internal or external), and alerts as well as audits.  For the alerts to be meaningful, audits and monitoring by human employees was required to actually detect and address unauthorized access of private user data.  While the Twitter Playbook provided the policies for such industry standards, Twitter lacked the systems in place to actually enforce and execute those standards.

56.  At all relevant times to this lawsuit:

    a.   Twitter did not have adequate access controls in place to restrict access to such sensitive data.

    b.   Twitter's system allowed personnel to access confidential user account information even though they were not authorized to do so.

    c.   Twitter was not monitoring access to this highly confidential account data or analyzing user activity logs for this data.

    d.   Twitter was not utilizing tools that detect unauthorized or anomalous behavior By employees or rogue insider activities with respect to this data, or if they

were, they were not receiving the reports of these tools.

   e.  Twitter was not restricting remote access to this sensitive account data, even by an employee who had gone absent from the workplace for a month.

   f.  Twitter was not enforcing its policies and confidentiality agreements.

   g.  Twitter had lax internal procedures regarding responses to emergency disclosure requests from an authoritarian regime.

   h.  Twitter's incident response procedures were lacking, since it apparently did not (a) conduct much of an internal investigation when it discovered Alzabarah's unauthorized access to the user account data or (b) engage law enforcement.  It simply confronted him, put him on leave, and let him walk off to get on a plane and leave the country.  This, despite Twitter having the authority and ability to detain Alzabarah and turn him over to the authorities for arrest and prosecution.

   i.  On information and belief, the private user account data Twitter stored was not encrypted.  Had it been encrypted, Alzabarah and Abouammo would not have been able to see the account information.

   j.  Twitter did not have an adequate human supervision process to monitor private user data.  Twitter will only be careful when there is a financial incentive for them to do so.

57.  As further evidence, in December 2015, Twitter told the FBI that they are tightening restrictions with respect to access to user information.  Yet, as of the Summer of 2020, 1,000 employees and contractors have access to and can even change user data.   Importantly, the FBI opened an investigation into Twitter out of national security concerns.  Twitter never learns.  Some of the contractors created fake user tickets to justify or excuse the intrusion.  There were so many account-spying episodes that the security team was unable to keep track of them.

58.  It was a significant departure from Abouammo's Alzabarah's prior practice to access these accounts.  Had Twitter had proper safeguards in place, they would have noticed that something was wrong and would have/should have investigated it. Neither Abouammo nor

**Formatted:** Line spacing:  single

**Formatted:** Page Number, Font: 9 pt

**Formatted:** Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around

Alzabarah had a legitimate reason to access these accounts. Indeed, neither Abouammo nor Alzabarah's job duties included a need to access a Twitter's user's private information and doing so was a reportable violation.

59. Alzabarah did not start using Profile Viewer until he started working for KSA. This should have been a red flag for Twitter. Alzabarah's access and use of Profile Viewer would have generated an alert in Twitter's security system as an unauthorized access. Unfortunately, because Twitter lacked the monitoring in place to address such alerts, Alzabarah's unauthorized access, though easily detectable, went unnoticed and unchecked.

60. In the exercise of due care any and all of Abouammo and Alzabarah's unauthorized access escapades should have been detected and been cause for intervention.

~~60.~~61. On February 20, 2015, Al Jabreen tweeted a photograph of himself with Alzabarah.

62. On March 8, 2015, Abouammo sent al-Qahtani a direct message via Twitter ~~61.~~ proclaiming, "proactively and reactively we will delete evil, my brother".

63. Alzabarah tells his wife on a Twitter owned laptop that he is going to Washington at the request of KSA

64. On May 13, 2015, Al Jabreen posted a photo of himself with MBS, exclaiming that ~~62.~~ he was honored to meet the dictator.

65. On the very next day, Alzabarah flew from San Francisco to Washington, D.C., ~~63.~~ where he stayed only twelve hours, to meet with representatives of MBS before returning to California.

66. KSA recruited Alzabarah to access Plaintiff's private Twitter information (e.g. direct ~~64.~~ messages and other confidential data and information that is not available to the public) and leak it to KSA.

67. Beginning on May 21, 2015, and continuing for approximately six months,

---

~~FIRST~~SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 3:19-CV-06694-LB

65.   Alzabarah accessed the confidential user data for nearly 6,000 Twitter users, including at least 33 names for which KSA security personnel had asked Twitter for "emergency disclosures." Alzabarah had no legitimate reason to access private user information.  Granting Alzabarah unnecessary access to so many accounts over such a long period of time is a glaring failure under established industry standards.  Indeed, the established industry standards provide that an employee must apply for access to private user data.  Had Twitter been following those standards, Alzabarah would not have been able to access the private user information that he did access because he would have had to apply to do so and his application would have been denied.  Further, such established industry standards indicate that even where an employee receives access to private user data after providing good cause for such access in an application, such access is only granted for a very limited period of time and 6 months vastly exceeds any established industry standards.

68.   To accomplish this, Alzabarah used official Twitter software called a Profile

66.   Viewer.  This Twitter software, along with other company tools, afforded Alzabarah access to  private account information.  Plaintiff is informed and believes and based thereon alleges that the account information that could be viewed by Profile Viewer and other means available to Alzabarah included but was not limited to information about the devices the account holder used, all recent IP information, logs containing the user's actions on Twitter, including direct messaging, logs containing information about the browsers used by the account holder, and all holder-provided biographical information.

69.   On May 22, 2015, the day after Alzabarah began his illegal searches, Abouammo

67.   resigned from Twitter.  On information and belief, Abouammo left Twitter having had unauthorized access for about 5 months and nobody at Twitter ever confronted him about it.

70.   The aberrant conduct of Abouammo and Alzabarah constituted "red flags" which should have alerted Twitter

68. did set off alerts to the riskTwitter of illegal and unauthorized activity.  Twitter disregarded facts which rendered Abouammo and Alzabarah unfit for continued employment in a sensitive position which allowed him to access confidential user data.

71.  On or about May 29, 2015, Alzabarah accessed, without authorization, private account information of two Twitter accounts over the course of approximately one hour.

72. Long after Abouammo had left Twitter, he continued contacting his former

69. colleagues to transmit KSA security officials' requests for private information about Twitter account holders.  Although Twitter managers asked him to stop, and to direct Saudi officials to contact Twitter directly.  Abouammo continued to handle this personally.  This also should have prompted Twitter to investigate what Abouammo had done while he was at Twitter.

73. In June of 2015 Alzabarah accessed private and confidential information from 5,726

70. Twitter accounts in violation of established industry standards. Unauthorized access to so many accounts in such a short period of time would have sent alerts to Twitter's security system.  However, because there was insufficient monitoring, the alerts went ignored.

74. The private confidential information Plaintiff had trustingly left in Twitter's care

71. included his unique and complex Twitter password, his IP addresses, and his direct messages, none of which Plaintiff had shared with the public or with KSA.

75. With the first month of raiding undetected by Twitter, on July 5, 2015 Alzabarah

72. again accessed Plaintiff's confidential and private information.

76. To his knowledge and recollection, Plaintiff has never even met Alzabarah or

73. Abouammo, and neither bears any personal malice towards Plaintiff.

77. Plaintiff had placed his full trust and confidence into Twitter that his data and anonymity with respect to his pseudonymous account would be protected.  Twitter breached that duty to him by allowing two employees to do what Twitter had promised Plaintiff would not happen: gain unauthorized access to his private user data and violate his privacy.

---

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

Importantly, on information and belief, Abouammo and Alzabarah raided both Plaintiff's regular account and pseudonymous account.

78.  Nonetheless, the danger Alzabarah and Abouammo posed to Plaintiff's confidential data was inherent in Twitter's manner of operation.  First, Twitter furnished Alzabarah and Abouammo with the access, hardware and software tools that enabled them to raid Plaintiff's private information.  This would not have been possible were they not employed by Twitter.  Second, Twitter implemented and benefited from policies that allowed and encouraged its technical and professional staff to work offsite, from multiple locations.  Although Twitter benefitted from the greater productivity this allowed, it even further reduced Twitter's ability to monitor sensitive employees' conduct.  Finally, Twitter implemented and benefitted from policies allowing its professional and technical staff flexibility as to when and where they performed their work, further complicating any monitoring Twitter should have been doing. With hundreds of millions of active users and a great many employees who had access to their data, the risk that confidential data would be exposed was broadly incident to Twitter's mode of operation.

79.  Despite all of the known risks that the private information of account holders was in danger, Twitter failed to institute adequate safeguards to protect this data or even alert Twitter's senior management that private account data was being raided.

80.  In 2015, Twitter's terms of service contained a privacy policy. The Twitter informed its users (including Plaintiff) by way of its privacy policy indicates effective May 18, 2015 that "Our default is almost always to make the information you provide through the Twitter Services public for as long as you do not delete it, but we generally give you settings or features, like direct messages and non-public communications on the Twitter platform allow users to control who saw their content., to make the information more private if you want." Twitter, due to the herein alleged conduct, has breached the terms of service and privacy policy.

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

81. , On or about June 19, 2015 and July 2015, Alzabarah accessed Plaintiff's account.

82. , Just weeks after the massive invasion of Twitter accounts, Alzabarah took an entire

77.   month of personal leave, beginning July 11, 2015.  He immediately flew to Saudi Arabia.  While on personal leave in Saudi Arabia he broke into the private and confidential information of hundreds of other Twitter account holders.  Inexplicably, Twitter permitted this and never confronted him over this until December 2, 2013 after Twitter was informed of Alzabarah's criminal activity by Western intelligence agencies.

83. - On or about September 27 and 28, 2015, Alzabarah without authorization accessed Mujtahid's private information

84. , On September 28, 2015, Mujtahid, the London-based whistle blower filed a formal

78.   complaint with Twitter, reporting that his private information had been illegally accessed.

85. , Despite being uniquely qualified and situated to discover the herein alleged

79.   breaches of confidential data, Twitter was either unaware of Abouammo's and Alzabarah's activities or chose to not investigate them until it was notified by Western intelligence officials.  On December 2, 2015, Twitter confronted Alzabarah with this information and placed him on administrative leave.  On information and belief, Alzabarah left Twitter having enjoyed unauthorized access for about 6 months and nobody at Twitter had ever confronted him about it until Twitter was notified by Western intelligence agencies in December 2015.

86. - The very next day Alzabarah, his wife, and his daughter fled the country after

80.   numerous telephone calls between him and the Saudi Consulate in Los Angeles. Alzabarah resigned from Twitter while flying out of the United States on December 3, 2015.

87. - In just one month, Alzabarah began using an email address. Neither Alzabarah nor Abouammo made any attempt to conceal their illicit

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Formatted: Highlight
Formatted: Highlight
Formatted: Highlight
Formatted: Normal, Right:  0.26",  No bullets or numbering
Formatted: Highlight
Formatted: Highlight
Formatted: Highlight
Formatted: Normal, Right:  0.26",  No bullets or numbering
Formatted: Highlight
Formatted: Highlight
Formatted: Normal, Right:  0.26",  No bullets or numbering
Formatted: Highlight
Formatted: Normal, Right:  0.26",  No bullets or numbering
Formatted: Highlight
Formatted: Line spacing:  single
Formatted: Page Number, Font: 9 pt
Formatted: Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around

activities while at Twitter.

**Twitter's Respondeat Superior Liability for the Theft**

88.  Twitter failed to follow FBI recommendations to report foreign travel, report foreign contact, etc.  Had Twitter followed these guidelines, they could have stopped Alzabarah and Abouammo

89.  ABOUAMMO and ALZABARAH had access to proprietary and confidential Twitter information, including information about Twitter users, such as the user-provided names and birthdates, device identifiers, relationships, phone numbers, internet protocol ("IP") addresses and session IP histories, among other things.

90.  Neither ABOUAMMO's nor ALZABARAH's job duties involved a need to access a Twitter user's private information and doing so was a reportable violation of the Twitter Playbook policies regarding handling and protecting user data.

91.  Neither ABOUAMMO nor ALZABARAH had authority from Twitter to receive, access, or produce user information pursuant to any governmental emergency disclosure request.

92.  Even after Alzabarah left the country, Abouammo continued to use his internal networks to gather information inside Twitter.  Abouammo continued to do this until at least March 1, 2016.  There is no indication from Twitter that it has plugged these leaks.

**How the Twitter Inside Job Harmed Plaintiff**

93.  The Profile Viewer software that Twitter let Abouammo and Alzabarah use allowed them to access private user account data, on both Plaintiff's public account and a pseudonymous account Plaintiff established so he could help people who might be afraid to be in touch with him directly. The data illicitly viewed by the Twitter employees exposed Plaintiff's name on the pseudonymous account, his IP address, his password, his direct messages, and his telephone number.  Neither Abouammo nor Alzabarah had any legitimate

---

~~FIRST~~SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

reason to be using the Profile Viewer software and doing so would have sent an alert to Twitter's security systems.

94.  Plaintiff relied upon Twitter promise that the direct messages (DMs) would remain private to help protect his allies, associates and those who merely sought to correspond with him but feared KSA retaliation were the relationship with Plaintiff were to become publicly known.  Some Twitter users in Saudi Arabia used direct messaging to ask Plaintiff to express analyses or opinions they were afraid to publicly express themselves. The privacy direct messaging offered was essential for conversations Plaintiff had with dissidents and activists who would be endangered were the authoritarian regime to learn of their beliefs.

95.  Plaintiff's DMs that Abouammo and Alzabarah raided and furnished to KSA included conversations with other dissidents and activists that Plaintiff wished to keep private and out of the public realm because of the sensitive nature of those conversations (relying upon Twitter's privacy policy) out of concern that if such conversations became public, Plaintiff would be harmed given the nature, content and individuals involved in those direct messaging conversations.

96.  On information and belief, Twitter records and preserves geolocation data on its users, even those using the supposedly private DM system.  Geolocation data of DM users made the users in Saudi Arabia vulnerable to surveillance and imprisonment.  On information and belief Twitter has denied that there are data logs which would show that Plaintiff's DMs had been accessed.  However, when Plaintiff refused demands that he return to Saudi Arabia KSA unleashed a brutal campaign upon a great many of people who had done nothing more than privately correspond with Plaintiff, arresting and imprisoning a great many of them within days of one another.

97.  Twitter employees Abouammo and Al-Zabarah also used Twitter software to

**Formatted:** Line spacing:  single

**Formatted:** Page Number, Font: 9 pt

**Formatted:** Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around

obtain the IP address of many of their victims, including Plaintiff.  At the time Plaintiff's private user Twitter data was stolen he had two tablet computers which he frequently used from his home.  Compromising an IP address greatly aids in locating people who frequently use a particular router.  Indeed, that  Plaintiff's public and pseudonymous accounts used the same static IP address would greatly aid any surveillance team in determining that both Twitter accounts may be operated by the same person.

98.  The value of knowing an IP address is apparent from the fact that Citizen's Lab, the NGO dedicated to protecting human rights through internet security was able to locate and identify Plaintiff as the first victim of the Saudi's Pegasus malware attack by tracing aberrant data traffic patterns to a particular static IP address.

99.  Twitter employees Abouammo and Alzabarah also used Twitter software to obtain Plaintiff's telephone number.  Access to this number enabled KSA to send the malware to Plaintiff's phone via a spear-phishing text message.[2]  Neither Abouammo nor Alzabarah had any legitimate reason to access this private information from Twitter's database and doing so would have sent an alert to Twitter's security systems.

100.  The information Twitter's employees stole and turned over to KSA was essential to MBS' plan to silence Plaintiff by threatening, and ultimately imprisoning and torturing his brother, his friends, and even just people who had exchanged messages with him on Twitter. Plaintiff's family had never been threatened until late in December 2015 or the first weeks of 2016, immediately after Alzabarah returned to Saudi Arabia to take his executive position in MISK.

101.  The interrogation of Plaintiff's family in early 2016 was followed by the

---

[2]  In 2013 when Plaintiff was 22 he gave his phone number to someone who posted it to the Facebook page of a Montreal film making group , as Plaintiff was looking for assistance in making a YouTube series about immigrants.  Although Twitter argues that its Saudi investors could have learned of his telephone number this way.  This unproven assertion is a matter for discovery, not resolution at the pleading stage.

**Formatted:** Line spacing:  single

**Formatted:** Page Number, Font: 9 pt

**Formatted:** Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around

imprisonment of his brothers and torture in 2018. Tragically, they are far from the only people to suffer in this manner.  In March of 2018, just months before Plaintiff's brothers were seized, Areej al-Sadhan, who had only used an anonymous account to Tweet his criticisms of MBS, was among those swept up by Saudi police.  Gamal Eid, executive director of the Arabic Network for Human Rights Information, or ANHRI, an Egypt-based group that monitors human rights violations in the region is emphatic that the timing of the arrests of five other Saudi critics who had used anonymous Twitter accounts shows that the arrests are linked to the data stolen by the two Twitter employees.  That data has allowed KSA to hunt down and persecute dissenters.

102.  Control over Twitter was actually a point of pride for MBS.  In 2015 MBS had bragged to Dr. Saad that MBS had had "our guy in Twitter" stop someone, which Dr. Saad understood to mean that a Twitter employee was covertly working for MBS.  In 2017 al-Qahtani, who had previously sought software that could be used to either ban Twitter users or to repeatedly freeze their accounts, boastfully tweeted, "Does a pseudonym protect you from the blacklist?  No."[3]

**Twitter's Refusal to Repudiate the Data Theft Impliedly Ratified the Thieves' Conduct**

103.  By December 2, 2015 Twitter had been told by government counterintelligence agents that Alzabarah had used his Twitter position and Twitter's software to obtain private user data, and that thousands of user accounts had been breached.

104.  On December 2, 2015 Twitter confronted Alzabarah, who readily admitted that he had accessed this information.  Twitter's security team had the legal authority to arrest Alzabarah on the spot pursuant to California Penal Code §837 permitting such arrests when a felony has been committed, and there is reasonable cause to believe the person arrested is the felon.  Yet instead of arresting Alzabarah, Twitter escorted him safely out of the building.  And

---

[3] It is a measure of KSA's control over Twitter that even this direct threat of government violence against other Twitter users did not lead to even a brief suspension of Al-Qahtani's account.  It would be another two years before he was finally banned from the platform.

Formatted: Line spacing:  single

Formatted: Page Number, Font: 9 pt

Formatted: Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around

instead of firing him, they merely suspended him. Alzabarah later resigned from his position at Twitter.

105.  Twitter knew that Alzarah had been working for KSA.  By October of 2015 the Saudi Royal Family owned more of Twitter's stock than did its founder and CEO, Jack Dorsey. In April of that year Twitter's share value had plunged 18% after a poor first quarter 2015 performance.  Twitter had every reason to downplay this major security breach, and to avoid antagonizing its largest investors.  And so it did.

106.  Twitter inexplicably waited at least nine days from the time government agents told Twitter of this massive insider job before breathing a word to anyone outside the company. There was no press release the way other data breaches were admitted.  There was no repudiation of KSA spying.  In fact, there was no mention of KSA at all.

107.  Nine days after bidding Alzabarah farewell Twitter quietly sent emails and in-application notices to some -- but not all -- of the victims.  Plaintiff and another prominent London-based dissident using the name Mujtahid, received no warning at all.  On information and belief, Twitter gave no notice to the popular press -- and did not even notify the "tech for laypersons" media such as CNET or Wired.  News of the theft filtered out only because some security researchers who were among the victims blogged or Tweeted about it.  Twitter did not tweet about it nor did it hold a press conference.

108.  Twitter's tight-lipped and cryptic warning was useless.   Twitter never told a soul that the Saudis, their investors, had done this.  Instead, Twitter merely cautioned that a "state actor" *might* have been involved, leaving victims utterly in the dark about whether the data had been stolen by China, Russia, or any other nation.  This was so mysterious Runa Sandvik, a security researcher who used to work for the Tor Project and now trains journalists in privacy and security criticized the notice as "not terribly helpful", telling a technology reporter that it gave her no information about who it was or what had flagged Twitter's suspicions.  What is more, there were no clear links between the users who did receive the December 11, 2015

Formatted: Line spacing:  single

Formatted: Page Number, Font: 9 pt

Formatted: Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around

notice.  Overall, the Twitter users who did receive the December 11, 2015 notice were just left confused and with more unanswered questions about what had even happened.

109.  Far from a full-throated repudiation of this massive theft, Twitter said nothing of the Saudi role.  It did not want to upset its KSA investors.  Twitter's December 11, 2015 notice did not redress the harm done by its employees: Abouammo and Alzabarah.

110.  Just one month after being caught, Alzabarah began using an email address

81.        showing his affiliation with the multi-billion dollar MISK Foundation, of which he is now the Chief Executive Officer.  MISK is MBS's personal foundation. Al-Qahtani sits on its Board of Directors. and  Al-Qahtani sits on its Board of Directors.  If Twitter had indeed been investigating Alzabarah after his resignation, they would have discovered this fact and should have warned the victims about it as it further evidenced that KSA had been behind the attack (the regime rewarded the Twitter spy with a prestigious and presumably lucrative job).

111.   SixIn the six months after Alzabarah fled, Twitter's CEO, Jack Dorsey, met with

82.        MBS, despite knowing full well that Alzabarah and Abouammo had pillaged Twitter accounts on behalf of KAKSA and knowing that MBS rewarded Alzabarah by making him CEO of MISK.  The following is a picture of Mr.Mr. Dorsey and MBS celebrating their meeting.did not forget to bow his head to the dictator who had been behind the raid of private information of his platform's users.



~~FIRST~~SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**Formatted:** Line spacing:  single

**Formatted:** Page Number, Font: 9 pt

**Formatted:** Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph,  Wrap Around



112.   Mr. Dorsey's subservience starkly contrasts with the behavior one may expect from an executive whose institution has been mistreated:



Formatted: Line spacing:  single

Formatted: Page Number, Font: 9 pt

Formatted: Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around

113. Twitter never revealed to the Plaintiff or the numerous other victims of this data

83. theft that the company derived great financial benefit from its relationships with KSA, other despots in the region, and millions of individuals living in Saudi Arabia.

114. Twitter also insisted on retaining the financial benefits of those relationships

84. despite the irreversible damage done to so many of its account holders.

85. On October 20, 2018, Abouammo was interviewed by FBI agents. He made false statements about why he had been given $100,000 of the $300,000 he had received, and created a false invoice that he gave to the FBI, purportedly justifying the payment.

86. On November 19, 2019, the United States Attorney's Office of the Northern District of California filed an indictment charging Abouammo, Al Jabreen and Alzabarah with violations of 18 USC section 951 (Acting as an Agent of a Foreign Government Without Notice to the Attorney General) (Case Number 3:19-cr-00621-EMC).

87. Plaintiff is informed and believes and thereon alleges that although Alzabarah invaded thousands of Twitter accounts of Saudi dissidents, KSA elected to use Pegasus malware to target only a relative few, including Plaintiff. Plaintiff is unaware of other Twitter users who KSA targeted with Pegasus malware. Plaintiff is informed and believes and thereon alleges that KSA targeted Plaintiff with Pegasus malware because of what KSA learned from accessing Plaintiff's Direct Messages on Twitter's platform that Alzabarah and Abouammo wrongfully accessed and furnished to KSA while Alzabarah was employed at Twitter. At least three of the Twitter users with whom Plaintiff had exchanged Direct Messages in 2015 were highly prominent Saudi dissidents living outside of Saudi Arabia. At least three others, inside Saudi Arabia, were imprisoned after Plaintiff's text messages with them were stolen.

115. Twitter was so tolerant of Saudi misconduct that it did not even begin canceling the fake Twitter accounts of Saudi bots until 2019, thus continuing in its pattern of avoiding taking any action that would protect users but upset KSA until it could not delay any further.

**Twitter's December 11, 2015 Notification Went to Only Some of the Victims. Plaintiff and Another Leading Saudi Dissident Were Strangely Excluded**

---

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19-CV-06694-LB

116.  On December 11, 2015, Twitter sent out a "safety" notice to the owners of ~~a few dozen~~some

of the accounts ~~Alzabarah had accessed including security and privacy researchers, surveillance specialists, policy academics and journalists.~~whose data had been ransacked.  The notice did not explain why Twitter had delayed at least nine days in notifying them.

117.  In addition to claiming it sent an email notice which at least Plaintiff and Mujtahid had never received, Twitter also claims that it sent an "in app" notice, complete with an "Acknowledge" button for recipients to click.  Tellingly, although Twitter has furnished the Court with what it purports to be a list of recipients of the email notice, it has never furnished anything to suggest that Plaintiff either received this "in app" notice or had acknowledged it.  Although Twitter claims to have sent this material, Plaintiff has not been allowed to conduct discovery to test Twitter's claim.  It is important to note that according to at least one article published on August 18, 2020, only a few dozen individuals received the December 11, 2015 notice.  According to the Guardian, Twitter sent the December 11, 2015 notice to more than 20 users.   The December 11, 2015 notice also claims that there were only a small number of accounts that "may have" been targeted.

**The December 2015 Notice Was False and Misleading**

118.  The notice Twitter claims to have sent Plaintiff included the following: "As a
~~88.~~    precaution, we are alerting you that your Twitter account is one of a small group of accounts that may have been targeted by state-sponsored actors".  Neither Plaintiff nor Mujtahid ever received this safety notice.  ~~Plaintiff is informed~~ and ~~believes~~, upon information and ~~thereon~~belief, alleges that Twitter never sent Plaintiff of Mujtahid this safety notice.  Nor did Twitter ever inform Plaintiff that the individual who targeted the accounts were working for KSA, or that KSA ~~had recruited~~ was so intent upon getting the data that it had gone to the

~~FIRST~~SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

trouble of recruiting Twitter employees to spy on him.  Nor did Twitter say that it was an inside job or what that the victims had in common (critics of KSA).  Twitter further tried to water down the notice by saying the recipients "may have" been targeted when in fact, Twitter had no reason to doubt that the raid of the information had actually happened.  Further, Twitter never updated the recipients of the notice.  Twitter also lied in the notice when it said "At this time, we have no evidence they obtained your account information, but we're actively investigating this matter.  We wish we have more we could share, but we don't have any additional information we can provide at this time."  In fact, Twitter did have additional information beyond what was contained in the notice (e.g. that it was KSA behind the attacks, that it was an inside job, the victims had commonalities in that they were critics of KSA).  On information and belief, Twitter deliberately chose not to share this information with the recipients because Twitter knew that if it did so, it would become public, would upset KSA and hurt Twitter's bottom line.  Twitter chose money over the safety of its users and complying with notice requirements in the event of a breach~~Twitter employees to spy on him.~~

89.  Instead, on February 17, 2016 Twitter sent Plaintiff a message indicating, among other things, that Twitter "recently learned about and immediately fixed a bug that affected our password recovery systems for about 24 hours last week.  The bug had the potential to expose the email address and phone number associated with a small number of accounts.  In our investigation, we discovered that the email address and phone number linked to your account was viewed by another account and we wanted to alert you as soon as possible."  A true and accurate copy of Twitter's message to Plaintiff is attached as Exhibit B.  This message did not warn Plaintiff that his account had been hacked by agents of KSA despite Twitter having reason to believe that this had happened to Plaintiff's Twitter account. The message also did not warn Plaintiff that KSA had recruited Twitter employees to spy on him.

---

~~FIRST~~SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

**~~–~~Twitter's Notification Process Violated the UCL and Twitter's Ongoing Disinterest in Security Makes This Certain to Recur**

119.  If Twitter had told Plaintiff the truth he would have taken additional

~~90.~~  precautions ~~including, but not limited to, being.~~  He could have gotten a new phone and new phone number.  Or he would have become much more careful about clicking on hyperlinks embedded in text messages unless he personally knew the sender and was confident that the text message came from the sender.  Plaintiff thus would not have clicked on the link on the text message that falsely purported to be from the package delivery service (which is what allowed KSA to hack Plaintiff's phone using Pegasus malware).

120.  ~~–~~Twitter's disdain and/or apathy for the security of its user's information continues to this very day.  In December 2015 Twitter claimed to the FBI that it had "enhanced its controls and permissions to restrict access to user information only to those whose duties require access." Yet in the wake of the recent hacking of 130 Twitter accounts including those of Barack Obama, Joe Biden, Elon Musk, Jeff Bezos, Michael Bloomberg, and Bill Gates, it has been revealed that over one thousand Twitter employees and off-site contractors had routine access to private user information.  Pursuant to the established industry standards, this constitutes too many people with access.

121.  According to former security employees, Twitter management has often dragged its heels on upgrades to information security controls, while prioritizing consumer products and features, a source of tension for many businesses.

122.  Efforts to control Twitter's user-support staff and contractors have also gotten short shrift, according to the former security employees who said that the security of users' private data was not a major concern for Twitter executives.  A former FBI cyber and cryptocurrency investigator, Patrick Westerhaus has warned that tech companies' "hyper-focus on growth and revenue" eclipses concerns for security.  On information and belief, this includes Twitter.

123.  In doing the things herein alleged Twitter consciously disregarded the rights of

~~FIRST~~SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 3:19 CV-06694-LB

~~91.~~   Plaintiff and of hundreds, if not thousands of other dissidents.  Twitter knows dissidents have depended upon it to host their sensitive communications.

### Plaintiff's Claims Against Twitter are Timely

124.  Plaintiff did not receive even the weak and unhelpful December 11, 2015 notification in any way.  He did receive the February 17, 2016 notification that his data may have been viewed "by another user", however this notice had nothing to do with the KSA inside job.  Neither notice even hinted that the Saudi government had stolen his data by way of an inside job at Twitter.  He first learned of this on October 20, 2018 when this data theft was revealed in the New York Times.  Until that day he did not know, and could not, in the exercise of reasonable diligence, be expected to know that the Saudi government had recruited and bought off two Twitter employees, who had been specifically instructed to get his private user data.  Nor did he know, and could not have been expected to know that the Twitter employees had accessed his data because the company had let them use software they could use for this purpose even though, in the words of the Department of Justice,  "Neither Abouammo's nor Alzabarah's job duties included a need to access a Twitter user's private information."

### McKinsey's Motive for Its Extreme and Outrageous Conduct

125.  McKinsey has played a critical role in MBS's drive to consolidate power in KSA.  McKinsey has earned many millions of dollars in projects in Saudi Arabia.  Between 2010 and 2016, McKinsey's project portfolio in Saudi Arabia has grown exponentially.  McKinsey has directly advised government agencies in KSA to the point that KSA's Ministry of Planning has acquired the nickname "Ministry of McKinsey" by some Saudis, including KSA's royal court.  In 2017, McKinsey purchased a politically connected Saudi consultancy, which added 140 more employees to McKinsey's already 300 employees in the region.

126.  McKinsey has maintained an office in Riyadh, the capital and main financial hub of Saudi Arabia.  The company's website boasts that its "Saudi Arabia Practice helps Saudi leaders."

127.  The Brookings Institute attributes "the Kingdom's new economic direction" and a major government cabinet reshuffling of high-ranking government ministers to McKinsey. MBS himself has admitted that "McKinsey participates with us in many studies."  McKinsey prepared a December 2015 report entitled "Moving Saudi Arabia's Economy Beyond Oil." That December 2015[4] report outlines an ambitious blueprint for KSA's economic transformation and diversification away from oil.  In what the Brookings Institute refers to as a "glaring omission," the December 2015 report fails to sufficiently explain how KSA "will be able to change the mindset of everyday Saudi Arabia citizens, who have long been accustomed to state largesse that included fuel subsidies, loans, free land, and public sector jobs."  The Brookings Institute goes on to insist that this is a "key issue" and questions how everyday citizens in Saudi Arabia will react to the reforms, referencing public discontent to a number of higher utility prices, which led to King Salman firing the water minister to appease the public.

128.  Key to this very expensive overhaul is a plan that has been sold to the Saudis called "Vision 2030" which is purportedly based upon a major restructuring of the Saudi economy, drastic austerity measures that will cut government benefits, and the imposition and escalation of user fees for government services which have previously been free. MBS' Vision 2030 resulted in many people losing their jobs, negatively affected and lost faith in the country because of that vision/program.  Despite his autocratic powers, public dissatisfaction with MBS' austerity measures has been strong.

129.  Although McKinsey has tapped the richest vein of Saudi consulting contracts, it still exists in a competitive environment with other consultants vying for the Royal Court's favor.  Western journalists have observed MBS putting on the consulting version of gladiatorial contests, with consultants from competing firms criticizing competing proposals in front of their "foes".  In this environment McKinsey is powerfully motivated to remain the KSA favorite.

---

[4] The Brookings Institute argues that the December 2015 report inspired MBS's report entitled "Saudi Arabia's Vision 2030".

---

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

McKinsey is so intent upon maintaining its relationship that when MBS had one of McKinsey's own senior partners arrested and beaten in a political purge, McKinsey dared not intervene -- or even complain.[5]

**It Was Foreseeable That Vocal Opponents of MBS's Plan Would be in Mortal Danger, Yet McKinsey Recklessly Disregarded This Risk for Money.**

130.  In or about December 2016, McKinsey prepared a report which identified the three most influential social media critics of MBS' austerity plan (one of the three was Plaintiff).  The report analyzed Twitter data from September and October 2016, and was finalized in December 2016.

131.  Before the report was drafted it was foreseeable that such information would be used to target dissidents at least in part because KSA's abysmal human rights record and utter contempt for democratic values, political criticism and freedom of expression was well-known, including to those living and working outside of Saudi Arabia.

132.  On or about June 29, 2015, Saud Al-Qahtani, then a Minister to the Royal Court, emailed The Hacking Company or Hacking Team to ask about its service.  Shortly after that, Khashoggi and other Saudi dissidents were subjected to massive Twitter attacks.

133.  KSA was infamous for suppressing critical political speech and sentencing numerous writers and dissidents to death or long prison terms,  Since at least December of 2015, it was common knowledge in circles knowledgeable about KSA affairs that very notable nonviolent dissidents were being kidnapped from foreign countries and forcibly taken to Saudi Arabia where, after being seized by government forces, they were never heard from again.

134.  The 2016 Human Rights Report from the U.S. State Department reported that judges were implicitly instructed to issue harsh sentences against human rights activists, reformers, journalists, and dissidents not engaged in violent activities."

---

[5]  The unfortunate partner is Hani Khoja.

135.  In January of 2016 Amnesty International reported that the sister of jailed blogger Raif Badawi was imprisoned in yet a further attempt to intimidate activists.

136.  Despite (or in furtherance of) this drumbeat of brutality and intimidation, in December 2016, McKinsey prepared a report that identified three of the most influential individuals on Twitter with respect to criticism of KSA's policies.  Plaintiff was one of these individuals.  On information and belief, McKinsey subsequently gave or displayed the report to agents of MBS and/or to MBS himself. On information and belief, MISK officials were present during the presentation of the McKinsey PowerPoint to MBS.

**Despite Full Knowledge of These Risks, McKinsey Prepared a Report Which Analyzed and Identified the Most Influential Opponents of MBS' Vital Policies**

137.  McKinsey's PowerPoint report, identified Plaintiff as one of the three loudest voices of discontent against KSA's policies sought to "gauge citizen sentiment on recent austerity measures announced in KSA" by closely analyzing "data from twitter feed."

138.  In other words, McKinsey's PowerPoint presentation filled a crucial blank space in how KSA would be able to pursue controversial economic reforms by identifying those who were spreading the most criticism of such reforms and eliminating them.

139.  Although the right-hand margin of each page carefully noted the date and time the report was last modified, and that the report had been printed, McKinsey took no steps to warn that the report was "private", or "confidential", or "for internal use only".  Plaintiff is informed and believes and thereon alleges that where McKinsey wishes to keep a report private, confidential and/or for internal use only, it would place a note on the report saying so.

140.  McKinsey provided the report/the information therein not only to MBS but to

other Saudi institutions to get contracts with official Saudi institutions.[6] McKinsey's goal was to warn KSA about the danger dissidents posed to MBS' Vision 2030 plan.    To further this goal the report was disseminated to many of the KSA government ministries.

141.  Every single critic exposed in the McKinsey report has been imprisoned except for Plaintiff. He has been safe only because he is in Canada.  This is why MBS has imprisoned and tortured family, friends, and associates.  MBS is well known for employing a technique known as "torture by proxy" whereby MBS targets Saudi-residing friends and family members of a dissident or political opponent who lives outside of Saudi Arabia.

142.  Up until the time of the publication of the McKinsey PowerPoint, there were Saudi dissidents active on Twitter that were harsher in their criticisms against MBS' austerity programs than Plaintiff.  However, those dissidents did not appear in McKinsey's report and were not persecuted after McKinsey gave or displayed the PowerPoint to agents of MBS and/or MBS himself.  Therefore, it is probable that the increased persecution of Plaintiff is due to the attention given to him by McKinsey.

143.  In addition to Plaintiff, the report identified two other influential persons, a Mr. Khaled Al-Alkami and an individual named "Ahmad.".  Just after McKinsey distributed the report, Alkami was imprisoned and "Ahmad" "disappeared."

144.  One person mentioned in the report (and not even one of the other two "influentials" highlighted alongside Plaintiff is a man named Isaa Hamed Anoukheify.  Although the report mentioned only one negative tweet Anoukheify made, he was arrested on March 24, 2017 some two to three months after the report's release.  A true and accurate copy of what Plaintiff believes is the McKinsey's report is attached as Exhibit A.

**The Predictable Consequences of Defendants' Misconduct**

145.  Up to the time Plaintiff applied for asylum in Canada in 2013, KSA had

_____

[6]  Although Twitter has disingenuously claimed that the New York Times "corrected" its reporting that this document was given to high level KSA officials, correction of Twitter's misleading account is beyond the scope of this Complaint and will be reserved for subsequent pleadings.

stopped paying his salary and cancelled his scholarship.  He was afraid that if he returned to Saudi Arabia, he would be persecuted (e.g. imprisoned, tortured or killed).  However, his family remained unharmed and free from harassment, arrest, imprisonment, and persecution from KSA.  Upon applying for asylum in Canada in 2013, Plaintiff was not concerned that KSA would persecute his family and friends in Saudi Arabia or send a hit team to murder Plaintiff in Canada.

92.146.   After defendants' misconduct KSA's persecution of Plaintiff intensified  to an unprecedented level.

147.   After Alzabarah improperly spied on Plaintiff's confidential Twitter data, and shortlyhe fled

93.   the United States on December 3, 2015.  Within a month after Alzabarah fled the United States, KSA interrogated Plaintiff's father and brother in Saudi Arabia, and cancelled thePlaintiff's brother's financial assistance, and imprisoned many of Plaintiff's friends in Saudi Arabia.  KSA also  KSA then and summoned three of Plaintiff's friends and roommates in Canada to the Saudi Cultural Bureau for interrogation.  One of them, who returned to Saudi Arabia, has been imprisoned between March 2016 and July 2016.  KSA had never targeted or pressured Plaintiff in this way before December 2015.  Apart from Twitter allowing KSA spies to access Plaintiff's private user data and furnish it to KSA, nothing out of the ordinary had happened in  2014 or 2015 to have triggered this escalation of persecution beginning in December 2015.    Before December 2015, the most KSA had done to Plaintiff was cancel his salary and his scholarship.  By the time Plaintiff applied for asylum in Canada in 2013, KSA had stopped paying his salary and cancelled his scholarship.  Although he was afraid that if he returned to Saudi Arabia, he would be persecuted (e.g. imprisoned, tortured or killed), Plaintiff felt entirely safe in Canada.  Further, his family remained unharmed and free from harassment, arrest, imprisonment, and persecution from KSA.  Upon applying for asylum in Canada in 2013,

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 3:19-CV-06694-LB

Plaintiff was not concerned that KSA would persecute his family and friends in Saudi Arabia or send a hit team to murder Plaintiff in Canada.

148. Before McKinsey published the PowerPoint report, Plaintiff was one of many dissidents who protested the corruption and human rights violations of KSA. After the publication of McKinsey's report, Plaintiff became one of three. By publishing this report and furnishing it to MBS, McKinsey effectively put a target on Plaintiff's back. The McKinsey PowerPoint made Plaintiff a much more prominent target for KSA and thereby increased Plaintiff's risk of persecution.

149. The McKinsey Report identified three "major influencers", Plaintiff, Khalid AlAlkami, and "Ahmad". After the report's distribution to MBS and/or his associates, AlAKami was imprisoned, Plaintiff was hacked and he, his family, friends, associates, were harassed, and "Ahmad" has disappeared – or has been disappeared. Another dissenter whose tweet was merely quoted as an example of "highly negative sentiment", Aesa al Nukhifi, was imprisoned on March 24, 2017.

150. KSA received an enormous amount of stolen private user data from its loyal Twitter employees. Plaintiff is informed and believes and thereon alleges that it would have taken many months if not years for KSA intelligence members to review and analyze the data to determine who they would target.

151. KSA kept the data until they were able to target Plaintiff directly (when Pegasus became available and operational to them as described below).

152. Plaintiff is informed and believes and thereon alleges that although Abouammo Alzabarah invaded thousands of Twitter accounts of Saudi dissidents, KSA elected to use Pegasus malware to target only a relative few, including Plaintiff. Plaintiff is unaware of other Twitter users who KSA targeted with Pegasus malware. Plaintiff is informed and believes and thereon alleges that KSA targeted Plaintiff with Pegasus malware because of what KSA learned

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

from accessing Plaintiff's Direct Messages on Twitter's platform that Alzabarah and Abouammo wrongfully accessed and furnished to KSA while Alzabarah was employed at Twitter.  At least three of the Twitter users with whom Plaintiff had exchanged Direct Messages in 2015 were highly prominent Saudi dissidents living outside of Saudi Arabia.  At least three others, inside Saudi Arabia, were imprisoned after Plaintiff's text messages with them were stolen.

153.  Fearing for his safety, Plaintiff withdrew from his studies and fled his residence, living in hotels for four months to avoid being kidnaped or harmed.

154.  It was not until the publication of the October 20, 2018 New York Times article that Plaintiff learned that a suspected KSA agent had used the computer access Twitter had granted him to hack into Plaintiff's confidential information at Twitter.

155.  Before McKinsey published its report, in December of 2016 or January of 2017, Plaintiff was one of many dissidents who protested the corruption and human rights violations of KSA, and was but one target among many.   After the publication of McKinsey's report, Plaintiff became one of the three most influential critics on social media.  By publishing this report and furnishing it to MBS, McKinsey effectively put a target on Plaintiff's back.

156.  Although Plaintiff's criticisms had already garnered attention from MBS and his allies it is highly probable that the combined effects of the disclosure of his private user information from Twitter and the spotlight shown upon him by the McKinsey report.  In addition to Plaintiff, the report identified two other influential persons, a Mr. Khaled Al-Alkami and an individual named "Ahmad.".  In December 2016 or January 2017, just a year after McKinsey distributed the report, Alkami was imprisoned and "Ahmad" "disappeared."  (One person mentioned in the report (and not even one of the other two "influentials" highlighted alongside Plaintiff is a man named Isaa Hamed Anoukheify.  Although the report mentioned only one negative tweet Anoukheify made, he was arrested on March 24, 2017 some two to three months after the report's release).

157.  In June of 2017, Loujain al-Hathloul, a feminist activist in Saudi Arabia, offered

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

Plaintiff financial support and aid in getting a position with Amnesty International.  In April of

94.    2018 she was imprisoned and charged for her contacts with Plaintiff.

95.  On October 20, 2018, the New York Times reported that according to a Saudi human rights group, after the McKinsey report was issued, Mr. Alkami was arrested.

158.   It was not until the publication of the October 20, 2018 New York Times article thatAfter defendants' misconduct, KSA's persecution of Plaintiff learned that a suspected KSAintensified to an unprecedented level.  Between April and June 2017, an agent of MBS approached Plaintiff and said he had used the computer access Twitter met with MBS.  The agent attempted to convince Plaintiff to return to Saudi Arabia.  This was during the same time period that MBS had grantedtried to lure Dr. Saad Aljabri, back to Saudi Arabia to imprison, torture and/or murder him to hack into. Dr. Aljabri, a former high-ranking Saudi official, had become a prominent opponent of MBS.

159.  From January 2018 to July 2018, Plaintiff had greatly restricted his social media

96.    presence, so the increased persecution inflicted upon him was more likely the result of KSA's analysis of Plaintiff's confidential information at Twitter.private Twitter data and the heightened scrutiny of Plaintiff resulting from McKinsey targeting him in its PowerPoint presentation.

160.   In mid-May 2018, two individuals working for KSAKSA agents contacted Plaintiff and asked to meet with him.

97.    Throughout a series of meetings with Plaintiff, these two individualsthey identified themselves as agents of MBS. According to a number of different reports, MBS was the one who gave the order to murder  and saidMr. Khashoggi.  The two agents also indicated that they were operating on orders from Saud Al-Qahtani, who was then a senior strategic advisor to MBS.  Al-Qahtani was dismissed after the murder ofThe Central Intelligence Agency has concluded that MBS ordered Mr. Khashoggi's murder, and Al-Qahtani was the strategist who organized itMr. Khashoggi, because his name was entangled with the murder.

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Formatted: Right:  0",  No bullets or numbering, Widow/Orphan control

Formatted: Right:  0",  No bullets or numbering, Widow/Orphan control

Formatted: Right:  0",  No bullets or numbering, Widow/Orphan control

Formatted: Line spacing:  single

Formatted: Page Number, Font: 9 pt

Formatted: Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around

161.  ~~The~~ two agents ~~indicated to~~told Plaintiff that MBS was not happy with Plaintiff's political

~~98.~~ activities and criticisms against KSA in general and MBS in particular.  The ~~two~~ agents demanded ~~(a)~~ that Plaintiff stop ~~his criticism of~~ criticizing KSA and MBS~~; (b)~~ and that ~~Plaintiff~~he return to Saudi Arabia ~~and return to his family and friends or return and go to prison~~.  Just as had been done with Khashoggi, the agents promised Plaintiff a bright future in Saudi Arabia.  Plaintiff refused ~~both demands.~~  When that failed the agents tried to persuade Plaintiff to come to the Saudi embassy in Ottawa with them.  Plaintiff again refused.  It should be noted that just a few months later, Mr. Khashoggi was lured to Saudi Consulate in Istanbul where assassins working for MBS murdered him.

162.  ~~During the meetings, the two agents demanded that Plaintiff accompany them to the Saudi embassy in Ottawa to continue the discussions.  Plaintiff did not accede to the agents' demand that he go to the Saudi embassy in Ottawa.  Plaintiff insisted that the meetings be held in a public place.  During the meetings, KSA agents arranged for Plaintiff's younger brother to be present as a message that they can reach and harm Plaintiff's family.  It should be noted that assassins working for KSA murdered~~  By the time Plaintiff refused to return to Saudi Arabia, KSA had significantly increased its spyware capabilities.  On information and belief, in 2017, KSA purchased or licensed the Pegasus spyware system from the Israeli cyber-spy company, NSO, for $55,000,000.  This sum included NSO's technical support and training so that the Saudis would be able to use the Pegasus spyware.

163.  On information and belief KSA was not able to deploy the Pegasus spyware until ~~99.~~the Spring of 2018 at the earliest.  ~~Mr. Khashoggi in a Saudi Consulate in Istanbul just a few months later.~~

~~100.  After the meetings with the two agents, Plaintiff continued his political activities and his friendship with Mr. Khashoggi grew closer.  In June and July 2018, plaintiff worked~~

---

with Mr. Khashoggi on the "electronic bees" project, which was intended to organize the large number of Saudi opposition activists to use Twitter in order to deal with what is called as "electronic flies"[7]. Indeed, Mr. Khashoggi transferred $5,000 to Plaintiff to support the "electronic bees" project.

101. With Abouammo and Alzabarah both out of Twitter, Plaintiff is informed and believes and based thereon alleges that KSA no longer had access to Plaintiff's direct messages, requiring KSA to devise another way to surveil Plaintiff's private communications. On or about June 23, 2018, agents acting on behalf of KSA using Pegasus software developed by N.S.O Technologies Ltd. and Q Cyber Technologies Ltd., remotely planted malware on Plaintiff's phone. Thereafter, KSA's attempts to silence Plaintiff by persecuting Plaintiff's family, friends and associates in Saudi Arabia intensified dramatically.

102. The malware was planted on Plaintiff's phone by means of a "phishing" direct message which was disguised as being from the shipping company, DHL. The message included a hyperlink which offered Plaintiff the opportunity to "Manage delivery". When Plaintiff clicked on the hyperlink (expecting a package) it downloaded the Pegasus malware to his phone.

103. KSA had previously contracted with NSO for the right to use this malware. Once the malware became operational to KSA, they acted. On June 23, 2018, Plaintiff's phone was infected by the Pegasus malware when he clicked on a link in a text message he had received. This was during the same period that Pegasus malware targeted and infected the smart phones of Dr. Saad Ajabri, and Ghanem Al-Masarir, another prominent Saudi dissident who was safely in the United Kingdom. Plaintiff was among the first Saudi dissidents KSA attacked with the Pegasus malware.

164. Once the malware was downloaded to Plaintiff's phone it installed itself on

---

[7] "Electronic flies" is a group of Twitter activists who take their orders from the Saudi authorities and whose objectives are (1) to devise another way to surveil opposition activities; (2) to smear opponents; (3) to praise decisions and actions of MBS.

---

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

[Formatted: Font color: Black]

[Formatted: Font color: Black]

[Formatted: Line spacing: single]

[Formatted: Page Number, Font: 9 pt]

[Formatted: Left, Position: Horizontal: Center, Relative to: Margin, Vertical: 0.28", Relative to: Paragraph, Wrap Around]

104.Plaintiff's smartphone it exfiltrated all of Plaintiff's SMS chats, emails,

photographs, location  data, and other information to KSA.

105.  - The Pegasus malware also enabled KSA to spy on Plaintiff, in "real time", through

control of his phone's camera and microphone, and through contemporaneous receipt of

information Plaintiff typed into his phone or received from others.

165.  - Plaintiff is informedThe intelligence gathered from Plaintiff's Twitter DMs and

believesother private user

106.  data, coupled with Pegasus' uploading and thereon alleges that Pegasus software did not

become availabletransfer to KSA until late 2017of all the data on Plaintiff's phone (which was

motivated by the McKinsey PowerPoint Report) enabled Al-Qahtani and thatMBS to  crush

Plaintiff's family and his social network.  In just a few short days between July 28, 2018  and

August 3, 2018 the Saudi's rounded up and imprisoned both of Plaintiff's brother, and dozens of his

friends, political allies, and even then it was not yet fully operational. mere correspondents.

166.  −Subsequently at the end of July 2018 and early August 2018, authorities acting on

107.  behalf of KSA increased their harassment campaign.  KSA security forces raided

Plaintiff's family home in Jeddah in the middle of the night using search dogs and conducted

humiliating searches of the house.-  Two of Plaintiff's brothers were arrested and are still in

prison without having been charged or receiving a trial.-  Security personnel acting on behalf of

KSA have been torturing Plaintiff's brothers to pressure Plaintiff to stop his activism.-  According

to a report by Amnesty International, such conduct is consistent with KSA security personnel's

mistreatment of imprisoned activists.-

167.   During the first few days of his imprisonment, KSA security personnel would take

108.   Plaintiff's younger brother out of his detention cell and ordered him to call Plaintiff to beg

Plaintiff to stop his political activities.   They specifically mentioned the "electronic bees" project,

which the Plaintiff worked on with the late Jamal Khashoggi and a small number of trusted close

friends.   That these KSA security personnel knew about Plaintiff's work to this level of detail

was shocking to Plaintiff.   At that point in time, Plaintiff had been unaware that KSA had been

spying on him using the Pegasus system on his phone.

168.   Plaintiff is informed and believes and thereon alleges that although Alzabarah

invaded thousands of Twitter accounts of Saudi dissidents, KSA elected to use Pegasus malware

to target only a relative few, including Plaintiff.  Plaintiff is unaware of other Twitter users who

KSA targeted with Pegasus malware.  Plaintiff is informed and believes and thereon alleges that

KSA targeted Plaintiff with Pegasus malware because of what KSA learned from accessing

Plaintiff's Direct Messages on Twitter's platform that Alzabarah and Abouammo wrongfully

accessed and furnished to KSA while Alzabarah was employed at Twitter, and because of the

heightened scrutiny to which he was subjected by the McKinsey report.

169.  Fearing for his safety, Plaintiff withdrew from his studies and fled his residence,

living in hotels for four months to avoid being kidnaped or harmed.

170.  Dozens of Plaintiff's friends and associates who live in Saudi Arabia have also

109.   been arrested, tortured, and subjected to inhumane and humiliating treatment even though

most of them are not involved or even interested in politics. KSA security personnel have done

this to pressure Plaintiff to stop his political activities.

171.   In mid-August 2018, Plaintiff was informed by Citizens Lab, which is part of the

110.   University of Toronto, that all of the information on his phone had been compromised by

means of Pegasus malware.

172.   On October 2, 2018, Mr. Khashoggi entered the Saudi Consulate in Istanbul,

111.  Turkey, where he was murdered by an assassination team sent by KSA (specifically by MBS).  Mr. Khashoggi, who championed democracy, human rights, and anti-corruption efforts, had been a fierce critic of KSA.

173.  –The collaboration between Plaintiff and Mr. Khashoggi had the potential to build  a

112.  A broad political movement for democratic reform in Saudi Arabia.  Due to hacking Plaintiff's phone, KSA was aware of the collaboration between Plaintiff and Mr. Khashoggi.

174.  On or about October 15, 2018, less than two weeks after the extrajudicial murder of Mr. Khashoggi, another team of Saudi nationals (known as the "Tiger Squad") traveled across the Atlantic Ocean from Saudi Arabia to Canada with the intention of assassinating Dr. Saad Aljabri and Plaintiff.

175.  KSA agents continue to improperly pressure Plaintiff to stop his political activities

113.  with the help of Twitter, which recently suspended two of Plaintiff's Twitter accounts (@say_it_and_walk and @i5beearmy) without good cause.

---

First Cause of Action Against Twitter, Inc., and Does 1-5  for Violation of the

176.  Stored Communications Act, 18 U.S.C. §2701, et. seq.On information and belief, McKinsey is still working with MBS and conducting training at his MISK Foundation.

**First Cause of Action Against Twitter, Inc., and Does 1-5  for Violation of the Stored Communications Act, 18 U.S.C. §2701, et. seq.**

177.  Plaintiff repeats and repleads each allegation in Paragraphs 1-113176 as though

114.  fully set forth herein.

178.  In invading and accessing Plaintiff's confidential Twitter information,

115.  Alzabarah and Abouammo intentionally exceeded their authorization to access that facility and thereby authorized access to electronic communication while it was in electronic storage.

179.  Plaintiff is informed and believes and based thereon alleges that one or more of

116.  Twitter's managing agents ratified this conduct by, *inter alia*, concealing from Plaintiff the fact that Alzabarah and Abouammo, while acting as agents for KSA, had wrongly obtained access to this information.

180.  Twitter's Chairman, Jack Dorsey, ratified this conduct by holding a cordial,

117.  meeting and posing for publicity photographs with MBS seven months after Dorsey learned that KSA had recruited at least two of Twitter's employees to steal the private and confidential information of thousands of Twitter account holders.

181.  As a direct and legal result of Twitter's violation of 18 U.S.C. §2701, Plaintiff

118.  has suffered loss of property and has incurred out-of-pocket expenses in excess of $75,000.  Plaintiff had to move out of his apartment, withdraw from his graduate studies, and actually lived in hotels for four months.

182.  As a direct and legal result of Twitter's violation of 18 U.S.C. §2701, Plaintiff

119.  has also suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to personal and professional reputation.

183. Twitter's unlawful actions were intentional, willful, and/or were taken in willful disregard of Plaintiff's 's rights.

184. In addition to general and economic damages, Plaintiff seeks punitive damages in an amount sufficient to punish Twitter and to protect future Twitter users from Defendant's wrongful practices described herein.

**Second Cause of Action Against Twitter and Does 1-5 for Violation of California Business & Professions Code §17200, et. seq.**

185. Plaintiff repeats and repleads each allegation in Paragraphs 1-121 184 as though fully set forth herein.

186. By doing the acts alleged above herein Twitter has violated the Stored Communications Act, and has engaged in an unlawful business practice that is prohibited by §17200.

187. By doing the acts alleged above herein Twitter has engaged in a fraudulent or deceptive business practice that is prohibited by §17200.

188. By doing the acts alleged above herein Twitter has engaged in an unfair business practice that is prohibited by §17200.

189. As a direct and legal result of Defendant's violation of §17200 et. seq., Plaintiff has suffered loss of property and has incurred out-of-pocket expenses in excess of $75,000.

190. As a direct and legal result of Defendant's violation of §17200 et. seq., Plaintiff has suffered humiliation, stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, loss of dignity, and damage to personal and professional reputation.

191. Plaintiff continues to use the Twitter platform for both public communications and what he hopes are confidential Direct Messages. He therefore remains at risk. Twitter's practices which led to his being harmed by invasion of his private data, and which misled him as to the source, nature, and gravity of the invasion pose a present danger that he

shall be harmed again.  If Twitter's practices remain uncorrected, Plaintiff and thousands of others shall be forced to choose between expressing themselves freely or safely.

192. ~~–~~Plaintiff therefore seeks mandatory injunctive relief to protect himself and ~~129.~~ future Twitter users from similar Twitter misconduct in the future.  Specifically, Plaintiff seeks:

~~a.~~ a.   A court appointed independent monitor, to be funded by Twitter, who shall regularly audit Twitter's security operations and ensure that they include an adequate number of skilled and experienced professional investigators sufficient to monitor the conduct of Twitter employees who have access to confidential user data and assess when the conduct of any such employee may represent a

risk to account holders.  This monitor shall be ordered to report directly to Twitter's Board of Directors and the Court on a quarterly basis;

~~b.~~ b.   Twitter shall develop and implement Monitor-approved policies and practice to ascertain whether Twitter employees are acting on behalf of a foreign government;

~~c.~~ c.   When user accounts are breached or are the subject of an attempted breach Twitter shall timely report to users whether the breach is reasonably believed to have been caused by a State-sponsored effort, and, if so, Twitter shall identify the State suspected to be involved; and

~~d.~~ d.   When a Twitter employee or contractor views a user's IP address, telephone number, email address, activity log, or any information which would identify the recipient of the user's direct messages, persons sending direct messages to the user, or the text of or images attached to any direct message, a user whose information is so viewed shall be notified of the date, nature, extent, and reason for such viewing and the Monitor shall be informed of the identity of the Twitter employee or contractor;

e.   e.   When user accounts are breached or are the subject of an attempted breach by a person or persons whom Twitter reasonably believes may be or have been a Twitter employee or contractor, Twitter shall timely report to users and to the Monitor that the breach originated internally.

**Third Cause of Action Against Twitter and Does 1-5 for**

**Invasion of Privacy**

193.   Plaintiff repeats and repleads each allegation in Paragraphs 1 129192 as though 130. fully set forth herein.

194.   Plaintiff had a legally protected privacy interest in the private direct messages 131. he had sent and received via Twitter.

195.   Plaintiff had a legally protected privacy interest in the personal data he had 132. stored on Twitter that contained information regarding his identity, telephone number, etc.

196.   Plaintiff's expectation that this information would remain confidential was 133. reasonable in that Twitter had promised its users that they would have control over such information.

197.   The invasion of Plaintiff's privacy interest in the confidential information and 134. the direct messages was offensive to Plaintiff and would offend a reasonable person.

198.   Plaintiff is informed and believes and based thereon alleges that one or more of 135. Twitter's managing agents ratified this conduct by, *inter alia*, concealing from Plaintiff the fact that Alzabarah and Abouammo, while acting as agents for Saudi regime, had singled out Plaintiff's account and wrongly obtained access to this information.   Dorsey's cordial meeting and public solicitude toward MBS also ratified this misconduct.

199.   As a direct and legal result of Defendant's invasion of Plaintiff's privacy,

136. Plaintiff has suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, mental anguish, and loss of dignity.

200. Twitter's unlawful actions are intentional, willful, and/or are taken in willful 137. conscious disregard of Plaintiff's 's rights.

201. In addition to general and economic damages, Plaintiff seeks punitive damages 138. in an amount sufficient to punish Twitter and to protect future Twitter users from Defendant's wrongful practices described herein.

**Fourth Cause of Action Against McKinsey & Co. and Does 6-10 for
Intentional Infliction of Emotional Distress**

202. Plaintiff repeats and repleads each allegation in Paragraphs 1-138201 as though 139. fully set forth herein.

203. McKinsey could not help but know of the vicious and brutal methods KSA has 140. used to suppress dissent, including attacks not only on dissenters, but on their close family members and associates.

204. Despite knowing these dangers, McKinsey intentionally, knowingly, or 141. recklessly named Plaintiff as one of the three most effective critics of KSA policies in the report that McKinsey prepared and furnished to MBS and/or his agents.

205. McKinsey's conduct in subjecting Plaintiff and his family to these dangers was 142. outrageous.

206. As a direct and legal cause of consequence of McKinsey's conduct Plaintiff has 143. suffered severe emotional distress.   Plaintiff suffers and continues to suffer humiliation, stress, anxiety, emotional distress, pain and suffering, mental anguish, and loss of enjoyment.

207. McKinsey's unlawful actions are intentional, willful, and/or are taken in willful 144. disregard of Plaintiff's 's rights.

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

208.   In addition to general and economic damages, Plaintiff seeks punitive damages 145. in an amount sufficient to punish Twitter and to protect future Twitter users from Defendant's wrongful practices described herein.

~~Fifth Cause of Action Against Twitter and Does 1-5~~

**Fifth Cause of Action Against Twitter and Does 1-5**

**for Intentional Misrepresentation**

209.   Plaintiff repeats and repleads each allegation in Paragraphs 1 ~~145~~208 as though ~~146.~~ fully set forth herein.

~~147.   Twitter, on or about February 17, 2016, represented to Plaintiff that a bug, that had been fixed, had affected Twitter's password recovery systems for about 24 hours the week prior.  This bug, Twitter represented, "had the potential to expose the email address and phone number associated with a small number of accounts.  In our investigation, we discovered that the email address and phone number linked to your account was viewed by another account and we wanted to alert you as soon as possible."~~

210.   Twitter, informed its users (including Plaintiff) by way of its privacy policy effective May 18, 2015 that "Our default is almost always to make the information you provide through the Twitter Services public for as long as you do not delete it, but we generally give you settings or features, like direct messages, to make the information more private if you want."

211.   Such representations were false and/or misleading.  Plaintiff is informed and ~~148.~~ believed and thereon alleges that from 2014 through 2015, Twitter lacked the requisite security systems to keep direct messages private from unauthorized access.  The effect of these representations, even if true, misled Plaintiff into believing that his ~~Twitter account had not been hacked by~~ direct messages on the Twitter ~~employees who had been recruited by the KSA to gain access to Plaintiff's private Twitter information~~platform would remain private as long as he did not share them publicly.

212.   Twitter knew that the representations were false and/or misleading when Twitter

~~FIRST~~SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

149.   made the representations.  Alternatively, Twitter made the representations recklessly and without regard for their truth and/or misleading nature.

150.  Twitter intended that Plaintiff rely on the representations.

213.  - to incentivize Plaintiff to use the social media platform because its business model profited from the number of users.

214.  Plaintiff reasonably relied on Twitter's representations by not taking the security

151.   precautions that he would have done so had he known the truth.

215.  –As a direct and legal result of Twitter's representations to Plaintiff, Plaintiff has

152.   suffered emotional distress, loss of property and has incurred out-of-pocket expenses in excess of $75,000.   Plaintiff had to move out of his apartment, withdraw from his graduate studies, and actually lived in hotels for four months

216.  –As a direct and legal result of Twitter's representations, Plaintiff has also

153.   suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to personal and professional reputation.

217.  –Twitter's conduct was intentional, willful, and/or are taken in willful disregard of Plaintiff's 's rights.

154.   of Plaintiff's 's rights. As such, Plaintiff seeks an award of exemplary and/or punitive damages against Twitter in a sum to be determined according to proof at trial.

Sixth Cause of Action Against Twitter and Does 1-5

**Sixth Cause of Action Against Twitter and Does 1-5**

**for Negligent Misrepresentation**

218.  –Plaintiff repeats and repleads each allegation in Paragraphs 1 154217 as though

155.   fully set forth herein.

219.  Twitter, informed its users (including Plaintiff) by way of its privacy policy

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

effective May 18, 2015 that "Our default is almost always to make the information you provide through the Twitter Services public for as long as you do not delete it, but we generally give you settings or features, like direct messages, to make the information more private if you want."

220.  Such representations were false and/or misleading.  Plaintiff is informed and believed and thereon alleges that from 2014 through 2015, Twitter lacked the requisite security systems to keep direct messages private from unauthorized access.  The effect of these representations, even if true, misled Plaintiff into believing that his direct messages on the Twitter platform would remain private as long as he did not share them publicly.  Twitter account had not been hacked by Twitter employees who had been recruited by the KSA to gain access to Plaintiff's private Twitter information.

221.  Although Twitter may have honestly believed that the representations were true and/or not misleading, Twitter had no reasonable grounds for believing the representations were true and/or not misleading when Twitter made such representations.

222.  Twitter intended that Plaintiff rely on the representations to incentivize Plaintiff to use the social media platform because its business model profited from the number of users.

223.  Plaintiff reasonably relied on Twitter's representations by not taking the security precautions that he would have done so had he known the truth.

224.  As a direct and legal result of Twitter's representations to Plaintiff, Plaintiff has suffered emotional distress, loss of property and has incurred out-of-pocket expenses in excess of $75,000.   Plaintiff had to move out of his apartment, withdraw from his graduate studies, and actually lived in hotels for four months.

225.  As a direct and legal result of Twitter's representations, Plaintiff has also suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to personal and professional reputation.

**Seventh Cause of Action Against Twitter and Does 1-5 for Concealment**

226.  Plaintiff repeats and repleads each allegation in Paragraphs 1-225 as though

fully set forth herein.

227.  Twitter, informed its users (including Plaintiff) by way of its privacy policy

156.   effective May 18, 2015 that "Our default is almost always to make the information you provide through the Twitter Services public for as long as you do not delete it, but we generally give you settings or features, like direct messages, to make the information more private if you want. "Twitter, on or about February 17, 2016, represented to Plaintiff that the bug, which had been fixed, had affected Twitter's password recovery systems for about 24 hours the week prior.  This bug, Twitter represented, "had the potential to expose the email address and phone number associated with a small number of accounts.  In our investigation, we discovered that the email address and phone number linked to your account was viewed by another account and we wanted to alert you as soon as possible."

228.  Twitter intentionally failed to disclose to Plaintiff that Twitter lacked the

157. requisite security systems to keep direct messages private from unauthorized access. Such representations were false and/or misleading. The effect of these representations, even if true, misled Plaintiff into believing that his Twitter account had not been hacked by Twitter employees who had been recruited by the KSA to gain access to Plaintiff's private Twitter information.

158.   Although Twitter may have honestly believed that the representations were true and/or not misleading, Twitter had no reasonable grounds for believing the representations were true and/or not misleading when Twitter made such representations.

159.  Twitter intended that Plaintiff relydirect messages on the representations.

160.  Twitter platform Plaintiff reasonably relied on Twitter's representations by not taking the security precautions that he would have done so had he known the truth.

161.  As a direct and legal result of Twitter's representations to Plaintiff, Plaintiff has suffered emotional distress, loss of property and has incurred out-of-pocket expenses in excess of $75,000.   Plaintiff had to move out of his apartment, withdraw from his graduate studies, and actually lived in hotels for four months.

1  ~~162.   As a direct and legal result of Twitter's representations, Plaintiff has also~~ ~~suffered stress,~~
2  ~~anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of~~
3  ~~enjoyment, and damage to personal and professional reputation.~~
4              ~~**Seventh Cause of Action Against Twitter and Does 1-5 for Concealment**~~
5  ~~163.   Plaintiff repeats and repleads each allegation in Paragraphs 1-162~~ remain private as
6  though ~~long~~ ~~fully set forth herein;~~
7              ~~164.   Twitter, on or about February 17, 2016, represented to Plaintiff that the bug,~~
8  ~~which had been fixed, had affected Twitter's password recovery systems for about 24 hours the~~
9  ~~week prior.   This bug, Twitter represented, "had the potential to expose the email address and~~
10 ~~phone number associated with a small number of accounts.   In our investigation, we discovered~~
11 ~~that the email address and phone number linked to your account was viewed by another~~
12 ~~account and we wanted to alert you~~ as ~~soon as possible."   However, Twitter~~ he did not ~~disclose~~
13 ~~to Plaintiff that his Twitter account had been hacked by Twitter employees who had been~~
14 ~~recruited by the KSA to gain access to Plaintiff's private Twitter information.   This misled~~
15 ~~Plaintiff to believe that his private Twitter information was safe and had not been hacked by~~
16 ~~Twitter employees who were agents of the violent, autocratic regime that Plaintiff criticizes.~~
17 ~~165.~~        share them publicly. The fact that this was not true  ~~Twitter~~ intentionally failed to
18 ~~disclose to Plaintiff that his private Twitter information had been hacked by Twitter employees~~
19 ~~who had been recruited by KSA to gain access to Plaintiff's private Twitter information [this~~
20 ~~fact~~ was known only to Twitter ~~(and intelligence officials)~~ and Plaintiff could not have
21 discovered ~~them~~ it on his own.   This misled Plaintiff into believing that his private Twitter
22 information was safe ~~and had not been hacked by Twitter employees who were agents of the~~
23 ~~violent, autocratic regime that Plaintiff criticizes.~~
24        229.   Plaintiff did not know that his Twitter ~~account had been hacked by Twitter~~
25        ~~employees who had been recruited by the KSA to gain access to Plaintiff's private~~
26        ~~Twitter information~~lacked the requisite security systems to
27
28

Formatted: Right:  0.32",  No bullets or numbering, Widow/Orphan control

Formatted: Font: Not Bold, No underline

Formatted: Right:  0.32",  No bullets or numbering, Widow/Orphan control, Tab stops:  0.88", Left + 0.94", Left

Formatted: Line spacing:  single

Formatted: Page Number, Font: 9 pt

Formatted: Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around

166. keep direct messages private from unauthorized access. (hereinafter "concealed facts").

167.230. Twitter intended to deceive Plaintiff by concealing the concealed facts because Twitter wanted to incentivize Plaintiff to use the social media platform because its business model profited from the number of users.

231. Had the concealed facts been disclosed, Plaintiff reasonably would have taken 168. greater safety precautions including but not limited to not relying on the direct messages to be private.

232. As a direct and legal result of Twitter's concealment, Plaintiff has suffered 169. emotional distress, loss of property and has incurred out-of-pocket expenses in excess of $75,000. Plaintiff had to move out of his apartment, withdraw from his graduate studies, and actually lived in hotels for four months.

233. As a direct and legal result of Twitter's concealment, Plaintiff has also suffered 170. stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to personal and professional reputation

234. Twitter's conduct was intentional, willful, and/or are taken in willful disregard 171. of Plaintiff's 's rights. of Plaintiff's 's rights. As such, Plaintiff seeks an award of exemplary and/or punitive damages against Twitter in a sum to be determined according to proof at trial.

**Eighth Cause of Action Against Twitter and Does 1-5 for Negligent Hiring, Supervision, or Retention of Employee**

235. Plaintiff repeats and repleads each allegation in Paragraphs 1 171234 as though

---

FIRSTSECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

Formatted: Right: 0.32", No bullets or numbering, Widow/Orphan control, Tab stops: 0.88", Left + 0.94", Left

Formatted: List Paragraph, Right: 0.32", Numbered + Level: 1 + Numbering Style: 1, 2, 3, ... + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75", Widow/Orphan control, Tab stops: 0.88", Left + 0.94", Left

Formatted: Right: 0.32", No bullets or numbering, Widow/Orphan control, Tab stops: 0.88", Left + 0.94", Left

Formatted: Right: 0.32", No bullets or numbering, Widow/Orphan control, Tab stops: 0.88", Left + 0.94", Left

Formatted: Right: 0.32", No bullets or numbering, Widow/Orphan control, Tab stops: 0.88", Left + 0.94", Left

Formatted: Right: 0.32", No bullets or numbering, Widow/Orphan control, Tab stops: 0.88", Left + 0.94", Left

Formatted: Line spacing: single

Formatted: Page Number, Font: 9 pt

Formatted: Left, Position: Horizontal: Center, Relative to: Margin, Vertical: 0.28", Relative to: Paragraph, Wrap Around

~~172.~~        fully set forth herein.

~~173.~~236.        –Twitter hired Alzabarah and Abouammo.

237.  –Alzabarah and Abouammo became unfit and/or hazardous to perform the work ~~174.~~ for which they were hired.

238.  –Twitter knew or should have known that Alzabarah and Abouammo each were ~~175.~~ or each became unfit and/or hazardous to perform the work for which they were hired, and that this unfitness and/or hazard created a particular risk to others including Plaintiff.

239.  –As a direct and legal result of Alzabarah's and/or Abouammo's unfitness and/or ~~176.~~ hazard, Plaintiff has suffered emotional distress, loss of property and has incurred out-of-pocket expenses in excess of $75,000.   Plaintiff had to move out of his apartment, withdraw from his graduate studies, and actually lived in hotels for four months.

240.  –As a direct and legal result of Alzabarah's and/or Abouammo's unfitness and/or ~~177.~~ hazard, Plaintiff has also suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to personal and professional reputation.

241.  –Twitter's negligence in hiring, supervising, and/or retaining Alzabarah and/or ~~178.~~ Abouammo was a substantial factor in causing Plaintiff's harm.

**Ninth Cause of Action Against Twitter and Does 1-5 for Negligence**

242.  Plaintiff repeats and repleads each allegation in Paragraphs 1-241 as though fully set forth herein.

243.  By failing to design, evaluate, operate, modify, and/or maintain its security systems in a reasonably careful manner, Twitter was negligent.  Further, by entrusting Alzabarah and Abouammo with the tools to gain access to Plaintiff's private user data, Twitter was negligent.

244.  As a direct and legal result of Twitter's negligence, Plaintiff has suffered

emotional distress, loss of property and has incurred out-of-pocket expenses in excess of $75,000.  Plaintiff had to move out of his apartment, withdraw from his graduate studies, and actually lived in hotels for four months.

245.  As a direct and legal result of Twitter's negligence, Plaintiff has also suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to personal and professional reputation.

246.  Twitter's negligence was a substantial factor in causing Plaintiff's harm.

**PRAYER FOR RELIEF**

1.   Compensatory damages for all economic loss, including but not limited to loss of past or future income, to the extent allowed by law.

2.   General damages for pain, suffering, humiliation, and emotional distress to the extent allowed by law.

3.   Punitive or exemplary damages, in an amount sufficient to punish the defendant and to deter future similar misconduct, to the extent allowed by law.

4.   Injunctive and prospective relief as the Court may order to prevent further wrongful acts, to the extent allowed by law.

5.   The costs of litigation, including reasonable attorney's fees, to the extent allowed by law.

DATED: August 27, 2020             RESPECTFULLY SUBMITTED

**KLEIMAN / RAJARAM**


By:   /s/ Mark Allen Kleiman, Esq.

_____

SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:19 CV-06694-LB

Mark Allen Kleiman, Esq.

**LAW OFFICES OF BEN GHARAGOZLI**
Ben Gharagozli, Esq.

Formatted: Indent: First line: 0", Line spacing: Exactly 22.75 pt, Tab stops: -0.75", Left + 1.17", Left + 1.56", Left + 1.94", Left + 2.33", Left + 2.72", Left + 3.11", Left + 3.5", Left + 3.89", Left + Not at -0.56" + -0.44" + -0.31" + -0.19"

Formatted: Line spacing: single

Formatted: Page Number, Font: 9 pt

Formatted: Left, Position: Horizontal: Center, Relative to: Margin, Vertical: 0.28", Relative to: Paragraph, Wrap Around

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable.

DATED: ~~February 11~~August 27, 2020          RESPECTFULLY SUBMITTED

**KLEIMAN / RAJARAM**

By:   _/s/ Mark Allen Kleiman, Esq._

Mark Allen Kleiman, Esq.

**LAW OFFICES OF BEN GHARAGOZLI**
Ben Gharagozli, Esq.

~~FIRST~~SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



Formatted: Font: Not Bold, No underline, Highlight

Formatted: Indent: Left:  0", First line:  2.5", Line spacing: single, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers, Tab stops:  -0.56", Left +  -0.44", Left +  -0.31", Left +  -0.19", Left + Not at 0.39" +  0.78" +  1.17" +  1.56" +  1.94" +  2.33" +  2.72" +  3.11" +  3.5" +  3.89"

Formatted: Line spacing:  single

Formatted: Page Number, Font: 9 pt

Formatted: Left, Position: Horizontal: Center, Relative to: Margin, Vertical:  0.28", Relative to: Paragraph, Wrap Around